Kenneth L. Cannon II (3705) (kcannon@djplaw.com)
Penrod W. Keith (4860) (pkeith@djplaw.com)
**DURHAM JONES & PINEGAR, P.C.**
111 South Main Street, Suite 2400
P O Box 4050
Salt Lake City, UT   84110-4050
Telephone:  (801) 415-3000
Fax:  (801) 415-3500

Proposed Attorneys for Debtor and Debtor in Possession

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>NOAH CORPORATION,[1] a Utah corporation,<br><br>Debtor and Debtor in Possession.<br><br>Tax ID Number:  02-0706434 | Bankruptcy Case No. 19-23840<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier |

### DECLARATION OF WILLIAM J. BOWSER IN
### SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

---

[1] The following limited liability companies were formerly subsidiaries of Noah Corporation but have been merged into Noah Corporation:  Noah Operations Albuquerque NM, LLC; Noah Operations Auburn Hills MI, LLC; Noah Operations Bedford NH, LLC; Noah Operations Blue Ash OH, LLC; Noah Operations Charlotte NC, LLC; Noah Operations Chesapeake VA, LLC; Noah Operations Cranberry PA, LLC; Noah Operations Des Moines IA, LLC; Noah Operations Dickinson TX, LLC; Noah Operations Fairview TX, LLC; Noah Operations Fossil Creek TX, LLC; Noah Operations Greenville SC, LLC; Noah Operations High Point NC, LLC; Noah Operations Hoover AL, LLC; Noah Operations Irving TX, LLC; Noah Operations Katy TX, LLC; Noah Operations Kingston TN, LLC; Noah Operations Lake Mary FL, LLC; Noah Operations Lincolnshire IL, LLC; Noah Operations Little Rock AR, LLC; Noah Operations Louisville KY, LLC; Noah Operations Madison WI, LLC; Noah Operations Memphis TN, LLC; Noah Operations Mentor OH, LLC; Noah Operations Morrisville NC, LLC; Noah Operations Naperville IL, LLC; Noah Operations New Albany OH, LLC; Noah Operations Oklahoma City OK, LLC; Noah Operations Omaha NE, LLC; Noah Operations Overland Park KS, LLC; Noah Operations Plano TX, LLC; Noah Operations San Antonio TX, LLC; Noah Operations South Jordan UT, LLC; Noah Operations Southpointe PA, LLC; Noah Operations Tulsa OK, LLC; Noah Operations Utah Valley UT, LLC; Noah Operations Westminster CO, LLC; and Noah Operations Wichita KS, LLC.

I, William J. Bowser, hereby declare as follows:

1. I am the President of Noah Corporation (the "Debtor," the "Company," or "Noah's"). I am responsible for and familiar with the day-to-day operations, business, and financial affairs of the Company. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge or my review of relevant documents. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2. The Company commenced a case under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on May 28, 2019 (the "Petition Date").

3. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the first day motions and applications (the "First Day Motions") filed contemporaneously herewith.

4. This Declaration is intended to provide a summary overview of the Company's business and this chapter 11 case. Part I provides an overview of the Debtor's organizational structure, business, capital structure, events giving rise to the commencement of the chapter 11 case, and the Debtor' financial outlook. Part II provides a summary of the First Day Motions which the Debtors seek to be heard on an expedited basis immediately following the commencement of these cases.

**A.    THE DEBTOR**

5. The Debtor is a Utah Corporation. It was created in 2003 and I was its founder. The Company opened its first events venue in Lindon, Utah in 2007. It has grown rapidly and currently operates 42 events venues in 25 states.

SLC_4305867.2

6.  The Debtor employs approximately over 500 full-time and part-time employees. The Debtor's corporate offices are currently in South Jordan, Utah.

**B.  THE DEBTOR'S BUSINESS**

7.  The Company began operation of its first events venue facility in Lindon Utah in January 2007. It opened its second facility in South Jordan, Utah in December 2009. Thereafter, the Company followed a modest growth plan with events facilities opening in Chandler, Arizona in the fall of 2010 Westminster, Colorado in the spring of 2011, and Irving, Texas in the spring of 2012). These first five facilities were solid incubators that helped to refine the size and layout of the facilities, governing policies and procedures to run multiple facilities across a wide geographical area, develop levels of management, and develop reservation software for booking, payment plans, and collection.

8.  With five locations across four states, solid bookings, a firm foundation in place, and despite an extremely difficult business environment during the "Great Recession," the Company was armed with confidence and began pursuing national developers to help accelerate growth. The Company researches potential markets, does site analysis, entitles properties where necessary, produces site plan drawings along with all building elevations and thereafter submits the projects to developers as long-term lease opportunities. The result of those efforts has produced 42 (37 additional) facilities during the period from the fall of 2012 until the present which mathematically is approximately six new facilities per year with the most recent opening in March 2019. A Salt Lake based company, which raises funding through the sale of tenant in common interests, Rockwell Debt Free 1031 ("Rockwell") has purchased all of the Company's available inventory of new locations over the past four years. The Company employs over 400

people across 25 states and will host over 4,000 events in 2019 with gross revenues of around $35 million.

9. As Noah's participated in the development of sites and then entered into a lease with the owners of the property, it created a new limited liability company subsidiary for each site. Ultimately, approximately 40 subsidiaries relating to the various venue facilities were created. Initially, it was intended that each subsidiary would have its own bank account and enter into its own contracts with clients for the events venue it leased. It became clear over time, however, that this structure was inefficient and costly. The Company developed a custom computer program with an India-based software developer, Kavinya, to process initial inquiries, manage the sales process, make reservations, take payments, and execute events. It became clear to the Company that a more centralized program for all of the venue facilities was much better and it transitioned to this process.

10. The Company's core business is to host events along with the associated beverage services. The Company does not offer catering services, photography services, entertainment or other ancillary services associated with the event industry. In short, the core of the Company's business is the rental of event-based space. Early in the life of an events facility weddings and social events represent nearly 85 percent of the events with 15 percent being corporate events. Facilities ultimately mature into a ratio closer to 60 percent wedding and social events and 40 percent corporate.

11. The Company first began to feel the beginnings of operational financial stress as related to the growth in the first quarter of 2017. The ratio of newer facilities to more established facilities began to have an ever eroding effect on cash flows to support those ratios. In short, we

simply grew too fast and lost our ability to react quickly to an ever-changing market by focusing too heavily on new locations versus making sure the fledgling locations had all the proper support. Simultaneously Noah's embarked on a quite expensive sister venture called "DUO". DUO was designed to leverage the Company's national brand, "Noah's."[2] The Company approached property owners who had unique and interesting properties on which we could host outdoor events by essentially taking the excess lead volume being created by the Company and using the assets of nearby facilities, thereby broadening the venue offerings. The acquisition of partner property owners was a tremendous success, however, translating that success into wedding bookings was an unmitigated failure which deepened the already brewing financial distress of the core business.

12. Additional financial stress was then caused by the trend in the wedding industry towards smaller wedding guest lists. In fact, by the middle of 2018, we had lowered our prices for the first time in a decade. The necessary price decreases were due in part to industry trends, but additionally due to the competitive forces associated with owners of warehouse properties and similar properties "dumping" vacant and largely unused weekend space onto the market at aggressive prices. Consequently, as the Company moved through the middle and latter quarters of 2017, we began examining and thereafter implementing new streamlined operational protocols for labor loads at the facility level, leadership structure at the middle management level and "rolling up" all of our operating facilities to realize significant savings in accounting, legal oversight cost, as well as tax preparation and reporting expenses at the corporate level. Reining

---

[2] There are two DUO entities which are subsidiaries of the Company, DUO Venues, LLC, and DUO Construction, LLC. Neither of them has been merged into to the Company and neither is in bankruptcy.

in all of the operational expenses, however, has proved to be an insufficient bridge to profitability. Ever-rising lease and property tax rates must not only be mitigated, but reduced to near market rates in order to balance our income to expense ratio.

13. The Company has hesitated to take the step of seeking to renegotiate lease rates but it has had to pursue this course over the last year as we are in a peculiar position with our landlords. Typically a business that leases a facility uses that facility as a place to conduct business, but another space of similar square footage would suffice. Noah's facilities are custom built for our business and the destabilization of the lease on that building in any way is a destabilizing force to the Company's entire enterprise. The facilities are purpose built and location and atmosphere sensitive. As a result, not just any old space will suffice. The Company should not have procrastinated the day of renegotiation that has brought us to this point but we now face a situation where both the Company and our landlords are forced to make long term decisions while holding a short fuse.

14. Despite all of the current turmoil, the Company believes we have a compelling case for a successful future should with new lease agreements as well as more favorable debt term lengths and rates. As the Company has sought restructuring of its leases and unsecured debtor, it has seen much-improved occupancy at the lower rates as well as ever increasing beverage revenues. Additionally, by placing a moratorium on growth, we have seen significant improvements in customer satisfaction through better online reviews and employee sales closing ratios through more intensive training. Additional revenue streams have been created as we have focused more attention on the existing enterprise.

15. There have been challenges recently. Several landlords declared defaults under the leases and three subsidiaries of the Company were required to file chapter 11 petitions to avoid eviction from the venue facilities that they lease. Noah Operations Richardson TX, LLC; Noah Operations Sugarland TX, LLC; and Noah Operations Chandler AZ, LLC (the "Affiliates") all filed chapter 11 petitions in this Court (*In re Noah Operations Richardson TX, LLC*, Bankr. Case No. 19-23492), *In re Noah Operations Sugarland TX, LLC,* (Bankr. Case No. 19-23571), and *In re Noah Operations Chandler AZ, LLC*, Bankr. Case No. 19-23810. Those cases are presently pending in this Court and the Debtor and the Affiliates have all filed motions seeking joint administration of their cases, which is one of the First-Day Motions pending in this case.

16. The Company's subsidiaries that lease events venues that had not filed bankruptcy were merged into the Company to consolidate and simplify the Company's structure. These subsidiaries are all listed in the footnote on the first page of this Declaration. As I noted, the each of the subsidiaries was initially formed with the intent to operate a specific facility leased by that subsidiary. It was intended that each subsidiary have its own bank account and enter into its own contracts with the customers for the facility leased by such subsidiary. From a business standpoint, however, the far better approach was to have the Company operate all of the facilities. At the time of the merger, none of the subsidiaries that were merged into the Company had its own bank account and none of them contracted directly with the customers that held events at the facility leased by such subsidiaries. Rather, customers contracted directly with, and paid, Noah Corporation. Essentially, the merged subsidiaries were, in most cases, simply named as the tenants on the leases. The only assets of those such subsidiaries were personal property

SLC_4305867.2                                7

located at the facilities, consisting mostly of tables and chairs. All of the individuals who operated the facilities were employees of the Company. All clients, vendors, and service providers to the facilities contracted directly with the Company and not the subsidiaries. And the pertinent insurance policies were also in the name of the Company (although the subsidiaries were also insured under such insurance policies).

17.    For the reasons set forth above, several months prior to filing the statement of merger, Noah's board of directors had already been seriously considering merging the subsidiaries into the Company. Once it became apparent that the Company was going to file a chapter 11 petition for itself, the Company decided to execute the already-contemplated merger as an initial, unofficial task incident to its contemplated reorganization plan. The three Affiliates who filed chapter 11 before the merger would have also been merged into the Company had such subsidiaries not already filed chapter 11 petitions prior to the date of the merger. The merger effectively consolidates and streamlines the Company's structure, rendering it more efficient and more reflective of its actual operations. I believe that of the creditors of the Company or the subsidiaries will not be harmed by the merger and I believe that most are benefited.

18.    With the actions taken by the Company and now leveraging our national footprint and brand we have begun offering corporate memberships to national and regional companies who host meetings and trainings across the country. Launching this program in December 2018 the membership program has already yielded over $300,000 in new sales volume in just four months. The Company believes that annual capacities for membership revenues is well over $3 million per year per over the existing enterprise. Additionally, in January 2019, the Company launched a national magazine ("Moments") utilizing our existing marketing staff. Existing

building staff, with support from the marketing team, are reaching out to vendors who supply goods and services to our clients to advertise in our online publication. Every Noah's location has its own edition (with national articles) with local vendor advertisements. Since its launch in January 2019 the program is now yielding over $40,000 per month in previously unrealized revenues. Revenue opportunity for the program is anticipated to reach over $250,000 per month in recurring revenues by the end of the fourth quarter of 2020.

19. By diversifying the Company's revenue streams well beyond the wedding and social markets, along with all of the aforementioned business strategies one could argue that the Company began its reorganization nearly one year ago. We started on this path later than we should have, but given the Company's new financial structure and the time necessary to fully realize all of these positive trends, including the time to substantially improve the ratio of mature to immature locations, the Company will fully recover for the benefit of its employees, clients, and creditors. Noah's will emerge from bankruptcy with a fair and reasonable plan of reorganization. It will use the "breathing spell" provided by chapter 11 of the Bankruptcy Code to renegotiate some or all of the leases, negotiate and adjust unsecured debt, and address overly high taxes to facilitate profitable operations going forward and payment of its debts.

C.  **FIRST-DAY MOTIONS**

20. The Debtor has filed a number of "First-Day motions" to enable it to keep its workforce intact, reassure clients, renegotiate certain leases, and restructure its debt.

21. <u>Application to Employ Mark Hashimoto as Chief Restructuring Officer</u>. The Debtor has engaged Mark Hashimoto to act as its Chief Restructuring Officer. Mr. Hashimoto is

eminently qualified for this position and the Debtor has filed an application for Court approval of the appointment.

22.     <u>Employee Wage Motion</u>.  On the Petition Date, the Company's employees had been paid wages and salaries through May 18, 2019.  This left approximately ten days of unpaid wages and salaries.  In addition, a number of employees had unreimbursed expenses and health care claims payable by the Company.

23.     The Debtor employs approximately 506 people working in both full time and part time positions.  The Debtor's annual employment costs for all employees total approximately $11,148,000.

     (a)     <u>Wages and Payroll Services</u>.

          (1)     The Debtor's employees are working in both full and part-time positions in the United States (the "Employees"). The Debtor has incurred certain costs and obligations in respect of its Employees that remain unpaid as of the Petition Date because they accrued prior to the Petition Date and either the method of payment has not "cleared," or these obligations only become due and payable in the ordinary course of the Debtor's businesses on and after the Petition Date.

          (2)     The average monthly gross payroll for all of the Debtor's Employees in the months prior to the filing has been approximately $923,000.  All of the Debtor's Employees are paid bi-weekly.  Approximately 457 of the Debtor's Employees are compensated at hourly rates, and approximately 49 of the Debtor's Employees are salaried.

(3) The Debtor's employees are paid bi-weekly with payment made one week after the end of the Debtor's regular and customary payroll period. A pay period ended on May 18, 2019 and employees were paid for that pay period on May 24, 2019. The Employees pursuant to such payment have thus been paid current for services rendered through May 18, 2019 by a payroll service. Such payment is made by direct deposit. Accordingly, the Employees, as of the Petition Date, had incurred wages from May 19, 2019 until the Petition Date on May 28, 2019. However, to the extent some payroll and expense-reimbursement checks issued to employees before the commencement of this case have not yet been presented for payment or have not yet cleared the banking system, the Debtor seeks permission to honor those prepetition amounts, if any.

(4) The Debtor's payroll is administrated by King & McCleary Payroll Services LLC ("Payroll Agent") and paid through direct deposit or check in a few instances. Average monthly fees relating to the administration of the Debtor's payroll by Payroll Agent is approximately $5700 per month with fees apportioned and paid with each payroll.

(5) As of the Petition Date, no Employee had earned more than $12,850, the statutory amount fixed by Bankruptcy Code Section 507(a)(4), solely in wages or salary that remained unpaid. As of the Petition Date, the total accrued unpaid wages for all Employees was approximately $325,000 including earned bonus payrolls and garnishments (the "Unpaid Wages"). The Debtor is seeking authorization to pay the Unpaid Wages pursuant to the Interim Order on an emergency basis.

(b)     <u>Withholding Obligations</u>.  The Debtor routinely withholds from Employee wages certain amounts that the Debtor is required to transmit to third parties for such purposes as Social Security, Medicare, federal and state income taxes, Health and Welfare Plans (as defined below) contributions, defined contribution retirement plan contributions, payroll deduction payment programs for various optional insurance programs, garnishments, and child support and other similar orders (the "Withholding Obligations"). The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, are not property of the Debtor's bankruptcy estate. The Debtor's estimated Withholding Obligations for the period including from May 19 through May 28 total approximately $130,000 for federal, employee and employer and related withholdings on wages and bonuses and some state withholding on wages as well as $2,000 in garnishments and $2500 in Health Savings Accounts payments ("HSA").  The Debtor also requests to pay an additional $39,000 for state wage withholding on states requiring quarterly payments – this amount represents withholding for April and May.  And finally an additional $25,000 to states that require monthly withholdings.  The Debtor represents that these amounts include employee/employer required withholdings and that such payment represents money withheld belong to employees or money held in trust for taxing agencies or money withheld, as set forth above, for garnishments or HAS payments.  The Debtor seeks authorization to continue paying the applicable Withholding Obligations in the ordinary course of business pursuant to the Interim Order.

(c)     <u>Business Expense Reimbursement</u>.

(1)     The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their business duties on behalf of

SLC_4305867.2

12

the Debtor, provided that such expenses satisfy the standards and guidelines of the applicable company's applicable expense reporting policy. Certain Employees travel as an indispensable part of their duties. To the extent they are incurred in accordance with applicable company policy, reimbursable expenses include lodging, transportation, meals, client entertainment expenses, professional licenses, and other miscellaneous business expenses (the "Reimbursement Obligations").

(2)     Approved Reimbursement Obligations are paid to Employees on a periodic basis upon receipt of a completed expense-reporting form evidencing the business expenses incurred. It is difficult for the Debtor to determine the exact amount of Reimbursement Obligations outstanding at any particular time because of the unpredictable and irregular nature of the travel and other events giving rise to the Reimbursement Obligations. Accordingly, the Debtor does not know the exact amount of Reimbursement Obligations accrued but unpaid as of the Petition Date, or the amount of Employee expenses incurred as of the Petition Date that are potentially eligible for reimbursement. The Debtor estimates approximately $176,701.59 in unpaid Reimbursement Obligations for which it seeks authority to pay on an interim and final basis.

(3)     The Debtor is seeking authority to pay Reimbursement Obligations for individual business expenses that were incurred in accordance with applicable company policy, in an amount of up to $12,850 per Employee under the Interim Order (total with unpaid wages not to exceed that amount), and any remaining reimbursement amounts that exceed the statutory limit consisting of the amounts of

$22,383.77 and $80,433.36 for two Employees under the Final Order, subject in each case to compliance with all applicable company business expense reimbursement policies and procedures and subject to the Debtor's reservation of right to present additional evidence at or before the final hearing on the two larger reimbursements exceeding the statutory limits for priority.

  (d) <u>Health and Welfare Benefits</u>.

    (1) The Debtor maintains a health and welfare benefit plans (the "Health and Welfare Plan"), and the Debtor's obligations related thereto, the "Health and Welfare Plan Obligations") for Employees, including, but not limited to, medical, dental and vision insurance. Additionally, the Debtor provides health flexible spending accounts and dependent care flexible spending accounts. The Debtor is self-insured with a catastrophic limit of $30,000 per month per covered employee. The Debtor pays premiums for covered employees and also pays claims incurred by employees.

    (2) Regular (non-temporary) salaried and hourly Employees are eligible for medical benefits upon being hired. The medical plans cover preventative care in addition to diagnosis and treatment for injuries and diseases.

    (3) The Debtor does not provide any retiree medical benefits to retired employees. Accordingly, the Debtor does not have any obligations governed by Bankruptcy Code Section 1114, which is limited to "retiree benefits" defined as "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any

plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."

(4) Based on historical experience, the Debtor estimates that, as of the Petition Date, the Health and Welfare Plans cost the Debtor approximately $39,000 per month in insurance premiums and claims – which amount includes $11,000 withheld from employees for the employee funded portion of the health care plan. The Debtor is seeking authorization under the Interim Order to pay all Health and Welfare Obligations.

(e) <u>Paid Time Off</u>. Eligible Employees accrue paid time off credits based on length of service. Paid time off includes vacation and sick leave. Eligible full-time employees may use accrued Paid Time off after 1 month of employment and eligible part-time employees may use accrued paid time off after 1 month of employment. The Debtor's Employees are compensated for unused paid time off on termination of employment provided they have met the service requirements to use accrued paid time off but in no case may they be compensated for more than 240 hours (the foregoing obligations, the "("Paid Time Off Obligations"). The PTO to date totals approximately $192,000.

(f) <u>Workers' Compensation Program</u>. The Debtor's workers' compensation program (the "<u>Workers' Compensation Program</u>") is provided by Traveler's and Ohio Bureau of Worker's Compensation for all/some of the Debtor's Employees. The Workers' Compensation Program provides statutory medical and wage replacement benefits. The Debtor has an established practice of paying wage replacement benefits for the initial days an Employee is ineligible for statutory benefits (historically the first three days of absence due to qualifying

illness or injury). The total cost for the Workers' Compensation Program averages $215,000 per year (the "<u>Workers' Compensation Obligations</u>").

24. <u>Client Obligations, Critical Vendor, and Payments to Affiliates for Use of Their Properties</u>.

    (a)    <u>Client Obligations</u>.

    (1)    The Debtor is in the business of operating events venues to a large and diverse client base (the "Clients"). Clients will reserve a venue for a wedding, wedding reception, business meeting, family activity, and a host of other purposes. The Debtor takes the reservation, receives a generally non-refundable deposit for the reserved use of the venue, and provides the venue for the reserved purpose. The events venue business is extremely sensitive to perceptions and requires the Debtor to maintain an excellent reputation for the space and services it provides.

    (2)    The principal Client Obligations involves the receipt and, in certain circumstances, refund of Client deposits. The current amount of deposits that the Debtor has received that could be subject to refund is approximately $1,975,000. Although most deposits from Clients are non-refundable, in the event that a Client is inadvertently charged or pays a double deposit or pays for, example, linens that that client does not use, it is critical for the Debtor to refund the deposit or overpayment. In addition, if an event is not held because of a mistake by the Debtor or inability of the Debtor to provide the service or venue, it is critically important for the Debtor to refund the deposit or payment.

    (3)    Maintaining the loyalty, support, and goodwill of its Clients is critical to the Debtor's reorganization efforts. The Debtor believes that the success and

viability of its business, and ultimately the Debtor's ability to maximize the value of its estate, is dependent upon the patronage and loyalty of its clients. In this regard, the Client Obligations are critical, and any delay in honoring them will severely and irreparably impair customer relations and drive away valuable Clients, thereby harming the Debtor's efforts to maximize value for all interested parties.

(4) It is standard in the Debtor's industry to refund deposits and overpayments to clients when there has been a mistake made with respect to the deposit or if the Debtor is unable to meet its obligation to rent the venue. The Debtor operates in a competitive industry. Therefore, the Debtor cannot afford to present anything less than a "business as usual" appearance to the public during the chapter 11 case. Much of the success and viability of the Debtor's business is dependent upon reputation, brand loyalty, and the confidence of its clients. If the Debtor is unable to refund prepetition deposits or overpayments in the ordinary course, disappointed clients could impair the Debtor's ability to conduct business and rent its venues for events will be severely hampered. On the other hand, continuing to honor Client Obligations as it has without interruption during the pendency of the chapter 11 case will help preserve the Debtor's valuable client relationships and goodwill, which will inure to the benefit of all of the Debtor's stakeholders including Debtor's landlords.

(5) The Debtor has determined, in the sound exercise of its business judgment, that the satisfaction of the Client Obligations in the ordinary course of business, the payment of the Critical Vendor's unpaid prepetition claim, and the payment to the Affiliates for the use of their property are critical to its reorganization efforts. The

failure to honor these obligations could have a material adverse impact on the Debtor's continued operation and, by extension, its efforts to complete an expeditious restructuring that maximizes value for stakeholders.

(b) <u>Critical Vendor</u>. The Debtor developed its own reservation system with the assistance of Kavinya, a software developer based in India (the "<u>Critical Vendor</u>"). The Debtor uses this system to process initial inquiries, manage the sales process, make reservations, take payments, and execute events on a server based in India. The Debtor believes that the Critical Vendor will turn off the server rendering the Debtor incapable of operating its venues unless the Critical Vendor is paid $100,867.00 in past prepetition due invoices. Payment of amounts owing to the Critical Vendor prepetition is critical to the ongoing operations of the Debtor. Without access to the server holding the contact/sales process/reservations/payments/execution of event software, the Debtor will be unable to operate its business. The Critical Vendor's location offshore complicates this issue. The Debtor believes that if the prepetition amounts owing to the Critical Vendor are not paid, the Critical Vendor will shut off the Debtor's access to the server. The Debtor is confident that if the Critical Vendor is paid prepetition amounts owing to it and the Debtor continues to pay it for current charges, the Critical Vendor will permit the Debtor to continue to use the process.

(c) <u>Payments to Affiliates</u>.

(1) The Debtor operates all of the venues, including those leased from third parties by Noah Operations Richardson TX, LLC; Noah Operations Sugarland TX, LLC; and Noah Operations Chandler AZ, LLC (the "Affiliates"), each of which has filed a chapter 11 petition in this Court. In re Noah Operations Richardson TX, LLC, Bankr.

Case No. 19 23492, pending before Hon. William T. Thurman); In re Noah Operations Sugarland TX, LLC, Bankr. Case No. 19-23571, pending Hon. R. Kimball Mosier; and In re Noah Operations Chandler AZ, LLC, Bankr. Case No. 19-23810, pending before Hon. Joel T. Marker.

(2) Historically, the Debtor has operated the business and used the venues leased from third parties, including the venues leased by the Affiliates. In exchange, the Debtor has in the ordinary course paid the Affiliates for the use of the leased venues. The monthly amount generally paid to or on behalf of the Affiliates is approximately $45,000 per Affiliate. The Debtor currently intends to continue to operate the venues of the Affiliates and believes that it is reasonable to continue to pay the Affiliates a reasonable sum for use of the Affiliates' venues. The Debtor understands that the Affiliates use amounts received from the Debtor to pay their own current obligations, including lease payments and other postpetition obligations. The Affiliates would not use these funds for prepetition obligations.

(3) Finally, the continued payment to the Affiliates in the ordinary course for the use of their leased properties is critical. If they are not paid for such use, they will not be able to make lease payments and other obligations and valuable venues operated by the Debtor could be lost.

25. <u>Joint Administration Motion</u>. The chapter 11 cases of the Debtor and the Affiliates should be jointly administered with each other. In the absence of joint administration, many duplicative efforts will have to be undertaken in these cases, at great expense to these estates and their creditors without any concomitant benefit for those creditors. I anticipate that a

plan of reorganization filed in the Debtor's case will include the facilities leased by the Affiliates. Moreover, because this Motion requests that the estates only be jointly administered and not substantively consolidated at this time, there will be no adverse effect on any creditor.

26. <u>Applications to Employ Professionals</u>. I have signed the various applications to hire professionals. The representations made in each of those applications are true and correct to the best of my knowledge.

27. <u>Motion to Extend Time to File Schedules and Statements</u>. The Debtor's case is complicated, involves hundreds of creditors, over 200 utilities, approximately forty commercial real estate leases, hundreds of owners of tenant in common interests who hold fractionalized interests in these leases, and over 500 employees. The staff of the Debtor working with the CRO and the Debtor's counsel needs an additional time to properly prepare the schedules of assets and liabilities and statement of financial affairs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

DATED this  31  day of May, 2019.

/s/ William J. Bowser<br>
William J. Bowser