Philip G. Jones, (1748)
Chapter 7 Trustee
1215 South Main
Orem, UT 84058
Telephone: (801) 224-5750
Email: Trustee@Theo7.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| In re:<br><br>NOAH CORPORATION,<br><br>Debtor. | Bankruptcy Case Number<br>19-23840-JTM<br>[Chapter 7] |
|---|---|
| **TRUSTEES SUPPLEMENTAL REPORT DATED 01/12/2021** | |

COMES NOW, Philip G. Jones, Trustee, and submits the following Supplement to his report to the Court dated 12/05/2020:

**Introduction**

1. After the filing of the Trustees Report, the Trustee and his Accountant were contacted by a number of individuals familiar with Noah's operations and provided additional information that contradicted information in the Report and opened additional avenues of investigation.

2. As a result, it was felt appropriate to supplement the original Report

**Cost of Venue Construction**

3. It is alleged that the construction cost of the venues was substantially lower than indicated by Bowser at the 341 Hearing. The actual cost was $1.9 to $2.1 million per venue, even though Noah had received as much as $4.9 million to construct each venue.

4. It appears that Noah simply spent all of the funds it received from whatever source without segregating those funds for their appropriate purposes. This appears to be the reason five of the venues were never build.

5. It also appears that Noah misrepresented the use of funds received.[1] According to one email:

> Mr. Bowser asserts he had already spent millions on site work, permits and pre-built walls at each site, but that is not true. In Carmel, for instance, we still do not have permits issued. In fact, I spoke to Mr. Brad Jensen in April 2019, when Noah first defaulted on its rent obligations. He runs operations for Gabriel Construction and is Bowser's son-in law. I asked him if it was true that site work had been done, windows had been ordered and money spent for construction.
>
> Mr. Jensen told me he did not know how I could have been told that since they weren't even scheduled to hire a contractor until the late fall of 2019, more than a full year after Noah had received our money from Rockwell. The building was supposed to be completed in early spring of 2019 and according to Bowser, they already had weddings scheduled.
>
> None of that was true. That preliminary money Bowser claims he spent on each property is simply more money that vanished. And to corroborate, according to the Inspectional Services Dept in Carmel, Indiana, as of April 2019, there was no site work done at Carmel. Since there were no permits the town would have filed an injunction against Noah if work had begun prior to issuance. The land had been purchased by Rockwell in June 2018 and Noah did not even incur that cost. So the difference between our $4.9 million and the $2 million it would have cost to construct the building represents Noah's profit.

6. There is also a question as to how Noah received “construction draws” for work that had not been done.[2]

**Venues Attempting to Work with Noah**

7. Substantial efforts were apparently made to do a pre-bankruptcy work out with Noah.

---

[1]Unbuilt Properties - Completion Plan. An Excel Spreadsheet prepared by Bowser. This report shows $663,000.00 in expenditures for Interior Complete, Exterior Brick/Awnings, Site, and Contingency on the Carmel site.

[2]Draw Sheet.

8. Over 30 separate Turn Around Plans were created by Bowser and Norm Merritt.

9. Unfortunately, it appears that these plans provided no protection to the property owners.

> Carmel ... voted against version 31 of the work out plan where Bil Bowser proposed the owners should sign over their land to Noah in exchange for a long-term note meant to repay our investment.
>
> Since the land represented the only value we had from our investments, the owners said no. We were exploring other avenues with Mr. Bowser. but he basically said we could either turn over the land and take the note or we would get nothing. Having already been defrauded by Mr. Bowser, we were loathe to give him land which he would likely sell and use to repay us for a short period of time, defaulting on our loan and giving up all our rights to litigate. That is where we left off when Noah filed bankruptcy. We were still exploring other options and had not shut off working out a new contract.

10. A potential bankruptcy was used as leverage by Noah, who appears to have been contemplating bankruptcy months rather than days before the actual filing.[3]

11. It also appears that as part of negotiations, Noah disclosed additional debt in the amount of $5,176,808 to a group called the Credit Club.[4]

**Noah as Alter Ego**

12. It is alleged that Noah was operated as an Alter Ego for Bowser and other insiders:[5]

Loans

> Bowser repeatedly took 'loans" out from the company which he never paid back. This was admitted in a letter from BTJD in response to our lawyer's (Clyde Snow) inquiries on our behalf. These loans began in 2005 and were added on and rewritten time and again so as to extend out the maturity date.
>
> It should be noted that these loans consisted of construction loans which were used to build Bowser and his wife a small home above a garage on his Peoa Utah property as well as compensation that was "reclassified" years later as loans. After constructing this residence, Mr. and Mrs. Bowser tore down their original home which by all accounts was in

[3]TIC Owners Update and Conference Call Summary.

[4]Noah's Debt Schedule.

[5]Investors Letter.

poor shape.

After constructing this apartment which contained an office with company funds, Mr. Bowser then leased the "office" to Noah Corp. When Noah Corp was unable to pay the monthly rent, Mr. Bowser was then allowed to write off some of the construction loan.

The signatures on most of the loan documents for both lender and borrower are William Bowser.

Rockwell Payments

Bil Bowser consistently told all shareholders including my husband and I that he had not taken any payments from Rockwell at any time. However, the lawyers from BTJD later admitted in writing to myself and one other shareholder that from time to time Bowser did accept payments for helping to close deals. On his personal income tax records for 2016, he noted he had received $102,000 thru Walby Inc. It was only after we pressed him that he did admit to receiving these payments but noted that Walby Inc was actually owned by his wife Susanna Bowser. We have since learned that the payments in 2016 actually were $58,000 more than the amount documented on his tax return. It would stand to reason that if Mr. Bowser took steps to conceal the true amount for 1 year, he most likely did this for additional years as well.

Salaries

Mr. Bowser has never been consistent about the amount of compensation he received from Noah, Gabriel, Rockwell, or any other entity. Within a 12 month period, 2017 - 2018, we received several writings from him which stated he was only making $84,000 per year. Then it changed to $105,000, then $120,000, then $150,000 until finally under oath his testimony revealed he was actually receiving salaries from Noah, Gabriel Management, and Gabriel Construction but he continued to maintain he did not receive anything from Rockwell except when forced to admit it because he had provided us his 2016 tax return.

Insider Payments

In reviewing company ledgers from 2014, 2015, 2016, 2017 as well as those filed in the bankruptcy we saw over and over again large reimbursements to Mr. and Mrs. Bowser as well as other insiders such as Steve Trumbo, Ron, and Nancy Neil, and other Bowser family members. Additionally, it should be noted that most of these figures were whole numbers rather than actual reimbursements which would most likely be odd numbers. (i.e. $15,000 vs. $14,832.67)

Numerous family members were employed by the company regardless of their skill set or capabilities. We had asked several times for Mr. Bowser to provide us with resumes for his family members to show that they were indeed the best-qualified employees and he consistently refused. By Mr. Bowser's own admission many of his family members including his elderly mother were employed by Noah's.

Following are some of the family members employed: Susanna Bowser, wife; Hayley Gardner, daughter; Kate Jensen, daughter; Scott Jensen, son in law; Brandon Jensen, Scott's brother; Eric Wynn, stepson; Marilyn Bowser, mother; Mark Bowser, brother' Michael Bowser, brother; Andrew Bowser, nephew. There were other company insiders who also employed their family members as well.

**Deceptive Practices**

13. It is alleged that Noah kept its investors in the dark regarding the actual status and operations of the company.

Business Structure

Bowser formed numerous LLC's in what appears to be an effort to confuse shareholders and conceal the true financial picture of the company.

In researching the company we discovered over 25 different LLC's formed and in reading your Trustee report have now discovered 3 additional LLC;'s that were previously unknown. In my conversations with shareholders, most shareholders had no idea this was going on and no reasonable explanation was ever given by Mr. Bowser as to why this was happening. A perfect example is Henfinas, LLC. In reviewing the company ledgers I noticed many payments being paid to this LLC and discovered this was another LLC began by insider Nancy Neal. From Board notes, I found that this company was formed to purchase supplies for the buildings. Why? As a business owner myself, this did not make sense to me. Later I had a shareholder with inside information tell me that Henfinias was actually paying an insider to do the buying of supplies and this was a way for them to filter money to that insider.

Shares

Mr. Bowser told me personally that in setting a value on the shares, he just picked a number and used that. Many of Noah's shareholders are over 70.5 and held their shares within their IRA's. These individuals consistently asked Mr. Bowser for him to create a way for them to take their required RMD's every year as they were getting hit with tax penalties. Mr. Bowser consistently acknowledged this was a problem and told them he would work on it but never did. Had he really been looking out for the best interest of the shareholders he could have revalued the shares since there was actually nothing to substantiate the value he "picked".

Mr. Bowser consistently sold shares for varying prices sometimes to the same people within the same year. Several shareholders have told me Bowser charged them anywhere from $1.00 per share to $7.50 per share. He would often offer shareholders a deal but then when they came back to take advantage of the reduced share price they were told they had to purchase at the higher amount.

On several instances, he told all shareholders at the annual meeting as well as individuals that he had not sold any shares since 2014 or 2015 however he later admitted in conversations with my legal counsel that he should not have said this as he continued to offer warrants, options and convertible notes for sale which of course was a dilution of shares.

Lack of Reports

Mr. Bowser never allowed a financial audit. In fact, when Jill Kirshnamuthry promised an audit on March 2, 2018, she was fired by the end of the month. In a conversation with me personally, she disclosed that as she pressed more and more for access to the company books and records Bowser became more and more distant until he abruptly terminated her at the end of March. He also fired the accounting firm she had hired to do the audit as was disclosed to me by Tanner and Company. He then concealed this termination and canceled audit from all shareholders until I discovered Jill was gone at the end of June. On July 3, 2018, he sent an update to shareholders finally revealing Jill was no longer with the company but he continued to assert an audit was in the works until he revealed in a meeting with lawyers present that the audit had been canceled in March.[6]

**SEC Complaint**

14, It appears that an SEC Complaint was filed against William J. Bowser, Christopher J. Ashby, Scott W. Beynon, and Jordan S. Nelson on December 30, 2020.

15. The Complaint lays out in detail how investors purchased “security interests” and were then systematically defrauded.[7]

**Preferential Transfers and Insider Payments**

16. The Trustee’s Accountant has obtained an Excel Spreadsheet as well as additional information that seems to indicate a greater number of preferential transfers and insider payments

---

[6]Another investor stated: He is not an innocent victim of greedy landlords. He avoided financial scrutiny and even fired the CEO of Duo Ventures (Jill Krishnamurthy) after she told board members at a meeting that she had engaged a financial firm to audit the books of Noah and she would be making quarterly financial reports available. Bil refused to give her access to the financials for the firm she was ostensibly running and then fired her shortly thereafter. He also fired the financial firm.

[7]Complaint in case 2:20-cv-00918-TS.

than had been previously disclosed to him.

17. Potential preferential transfers of $624,781.00 were discovered.[8]

18. Potential insider transfer of more than $2,033,459 have been discovered.[9]

**Conclusions**

19. The information provided to the Trustee comes from individuals associated with unbuilt venues as well as earlier investors in Noah.

20. It appears that funds provided to Noah by investors as well as clients were treated in the same way. They were simply spent with no effort to spend those funds on their stated purpose.

21. The Trustee still does not have a clear idea of where all the funds went that were paid to Noah.

22. Most of the companies expenditures do not have appropriate documentation.

23. A detailed investigation would likely find many more inappropriate transfers (or transfers that the Debtor could not prove were for legitimate business purposes).

24. The Operations of the Debtor do not pass the smell test.

25. Potential improper transfers have increased from $1,195,210.57 to $3,853,450.57.

26. It is clear to the Trustee that even in a best case scenario, where all known improper transfers were collected and there were no costs of collection, less than 32% would be returned to priority and/or administrative claims ($12,034,509.73) and no return would be made to unsecured creditors. If it could be proved that the $13,000.000.00 cancellation of debt was part of a fraud scheme, then there might be funds available for unsecured creditors.

[8]Attachment to Memo from Accountant.

[9]Memo from Accountant.

27.  In an ideal world a full investigation would be made to give closure to investors and clients of the Debtor, and clearly identify the malfeasance that may have taken place.

Dated this 12th day of January, 2021


 /s/ Philip G. Jones
Philip G. Jones, Trustee

DRAW SHEET

Owner ROCKWELL 1031 - IN, CARMEL

Job Location IN, CARMEL - BUDGET

| Item No. | DESCRIPTION OF WORK | SUB-CONTRACTOR | | BUDGET | NET BALANCE | DATE DRAW 0 | 06/05/18 DRAW 1 | 06/20/18 DRAW 2 | 07/05/18 DRAW 3 | 07/20/18 DRAW 4 | 08/05/18 DRAW 5 | DATE DRAW 6 | DATE DRAW 7 | DATE DRAW 8 | DATE DRAW 9 | DATE DRAW 10 | DATE DRAW 11 | DATE DRAW 12 | DATE DRAW 13 | DATE DRAW 14 | DATE DRAW 15 | DATE DRAW 16 | DATE DRAW 17 | DATE DRAW 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| L&C | Land & Carry Cost | Sub Total | | 831,783.25 | 0.00 | 831,783.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Land Cost | Adjustment to land | | [illegible] | | | | | | | | | | | | | | | | | | | | |
| | Carry Cost | | | [illegible] | | | | | | | | | | | | | | | | | | | | |
| A&E | Architecture & Engineering | Sub Total | | 328,947.68 | 0.00 | 0.00 | 328,947.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Architecture, Const. Team & Engineering | | | | | | | | | | | | | | | | | | | | | | | |
| | Permits & Fees (impact) | | | | | | | | | | | | | | | | | | | | | | | |
| | Sales Tax (as applicable) | | | | | | | | | | | | | | | | | | | | | | | |
| S.Eq | Specialty Equipment | Sub Total | | 576,000.00 | 0.00 | 0.00 | 400,002.32 | 175,997.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Wise Cabinetry - CM Package | | | | | | | | | | | | | | | | | | | | | | | |
| | Ark 1 - Elevo Package BAPU | | | | | | | | | | | | | | | | | | | | | | | |
| FFE | Furniture Fixtures & Equipment | Sub Total | | 249,578.00 | 0.00 | 0.00 | 0.00 | 249,578.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Furniture, CPU, Exterior/Interior Equipment | | | | | | | | | | | | | | | | | | | | | | | |
| GenC | General Conditions | Sub Total | | [illegible] | 0.00 | 0.00 | 0.00 | [illegible] | 98,655.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Insurance - GL, Builders Risk | | | | | | | | | | | | | | | | | | | | | | | |
| | Construction site fencing, trailer, toilet, trash, equipment rental | | | | | | | | | | | | | | | | | | | | | | | |
| | Temp/Clean service | | | | | | | | | | | | | | | | | | | | | | | |
| | SKINNER | | | | | | | | | | | | | | | | | | | | | | | |
| US | Utility Services | Sub Total | | 7,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Construction Services Power, Water/Sewer, Gas | | | | | | | | | | | | | | | | | | | | | | | |
| | Temp services Power, Gas & Water | | | | | | | | | | | | | | | | | | | | | | | |
| | Building Services Internet, Phone, Alarm, TV | | | | | | | | | | | | | | | | | | | | | | | |
| SW | Site Work | Sub Total | | 289,388.32 | 0.00 | 0.00 | 0.00 | 0.00 | 289,388.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Site Work | | | | | | | | | | | | | | | | | | | | | | | |
| | Building Excavation | | | | | | | | | | | | | | | | | | | | | | | |
| | SWPPP | | | | | | | | | | | | | | | | | | | | | | | |
| UC | Utility Construction | Sub Total | | 170,965.00 | 0.00 | 0.00 | 0.00 | 0.00 | 170,965.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Sewer & Water, Culinary & fire | | | | | | | | | | | | | | | | | | | | | | | |
| | Storm Water System | | | | | | | | | | | | | | | | | | | | | | | |
| | Natural gas | | | | | | | | | | | | | | | | | | | | | | | |
| | Electrical & Low voltage conduit | | | | | | | | | | | | | | | | | | | | | | | |
| SC | Site Concrete | Sub Total | | 207,177.00 | 0.00 | 0.00 | 0.00 | 0.00 | 207,177.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Site Concrete | | | | | | | | | | | | | | | | | | | | | | | |
| BC | Building Concrete | Sub Total | | 110,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 110,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Building Concrete, foundation & pad | | | | | | | | | | | | | | | | | | | | | | | |
| RS | Rough Structure | Sub Total | | [illegible] | 0.00 | 0.00 | 0.00 | 0.00 | 72,714.00 | 186,298.00 | [illegible] | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Rough Carpentry Material: Trusses, lumber, Entry Trellises, building wrap | Adjustment to land | | (193.75) | | | | | | | | | | | | | | | | | | | | |
| | Rough Carpentry Labor | | | | | | | | | | | | | | | | | | | | | | | |
| EB | Exterior Building | Sub Total | | 642,591.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 642,591.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Exterior Finishes: Roof, Doors Windows, Brick Tile, Cast Stone, Metal flashings & Caps | | | | | | | | | | | | | | | | | | | | | | | |
| Lan | Landscaping | Sub Total | | 171,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 153,123.00 | 18,377.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Garden Walls - CMU & Brick | | | | | | | | | | | | | | | | | | | | | | | |
| | Garden Pavers / Trash Enclosure | | | | | | | | | | | | | | | | | | | | | | | |
| | Irrigation, Plantings, Fencing as needed | | | | | | | | | | | | | | | | | | | | | | | |
| | Tree Mitigation (as applicable) | | | | | | | | | | | | | | | | | | | | | | | |
| Mech | Mechanical | Sub Total | | 184,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 184,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Plumbing, Sub, Rough & Finish | | | | | | | | | | | | | | | | | | | | | | | |
| | Gas Lines | | | | | | | | | | | | | | | | | | | | | | | |
| | HVAC | | | | | | | | | | | | | | | | | | | | | | | |
| FS | Fire Systems | Sub Total | | 49,550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 49,550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Fire riser, suppression, alarm, safety signage | | | | | | | | | | | | | | | | | | | | | | | |
| Elec | Electrical | Sub Total | | 144,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 144,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Lighting Fixture Package -FSG | | | | | | | | | | | | | | | | | | | | | | | |
| | Electrical: Interior, Exterior & low voltage | | | | | | | | | | | | | | | | | | | | | | | |
| RI | Rough Interior | Sub Total | | 46,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 46,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Insulation, Sheetrock, wall paneling | | | | | | | | | | | | | | | | | | | | | | | |
| FL | Flooring | Sub Total | | 101,856.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 101,856.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Tile, Wood & Carpet Material | | | | | | | | | | | | | | | | | | | | | | | |
| | Flooring Labor | | | | | | | | | | | | | | | | | | | | | | | |
| IF | Interior Finishes | Sub Total | | 151,777.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 151,777.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Carpentry: Door Package | | | | | | | | | | | | | | | | | | | | | | | |
| | Carpentry: Running millwork package | | | | | | | | | | | | | | | | | | | | | | | |
| | Finish Carpentry and Door Install | | | | | | | | | | | | | | | | | | | | | | | |
| | Paint: Exterior, Interior & Wall coverings | | | | | | | | | | | | | | | | | | | | | | | |
| SP | Specialty & Hardware | Sub Total | | [illegible] | 29,466.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | [illegible] | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Hardware | | | | | | | | | | | | | | | | | | | | | | | |
| | Exterior Building Signs | | | | | | | | | | | | | | | | | | | | | | | |
| | Misc. Metals | | | | | | | | | | | | | | | | | | | | | | | |
| | Land & Carry Total | | | 831,783.25 | | | | | | | | | | | | | | | | | | | | |
| | Site Work Total | | | 836,030.32 | | | | | | | | | | | | | | | | | | | | |
| | Building Total | | | 3,545,186.43 | | | | | | | | | | | | | | | | | | | | |
| | Grand Total | | | 5,213,000.00 | 29,466.75 | 831,783.25 | 728,950.00 | 969,000.00 | 953,800.00 | 982,000.00 | 698,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

TIC OWNERS UPDATE and CONFERENCE CALL SUMMARY

# TIC Owners Update and Proposal
# April 7, 2019

**CAVEAT: Norm Merritt has undertaken an effort to determine whether there is an acceptable Noahs workout plan from his own perspective based on his own interviews with Bil Bowser, CEO of Noahs, and his own analysis of information and models provided by Bil. Mr. Merritt is sharing that here as a courtesy to other property owners. Each owner will need to determine the advisability of relying on this information on their own. Mr. Merritt hereby absolves himself from any liability associated with any person's reliance on the opinions and proposals made herein.**

**Update**

Norm received the first draft of the Noahs Turnaround Plan from Bil Bowser on Friday 4/5 as Bil had committed. Norm held phone conversations with Bil several times over the course of the weekend to make suggested added details and moving Bil towards commitments and milestones that might be acceptable and measurable to and by owners. **The proposal noted below is Bil's proposal.**

According to Bil, he feels an obligation to owners to work out a plan – in particular those whose life savings are at risk. He said he feels "honor bound to not go bankrupt." In his mind the only alternative to a plan is bankruptcy. While he reports that his lawyers have strongly recommended bankruptcy to him, he does not want to pursue that course as he feels it "walks away from a lot of value and will leave owners with pennies on the dollar."

**Alternative Scenarios**

As with any complex business decision, Owners will need to determine their optimal course forward. The two main options are contrasted here:

OPTION 1: Work with Bil on a workout plan. Take advantage of the cash flow generation capability of Noahs and give them a chance to absorb the recent growth in new facilities to get things back on track. Put in place safeguards and "teeth" to ensure Bil does not go astray again and that he keeps his commitments.

OPTION 2: Evict Noahs from facilities that are currently up and running, find another tenant or operator, pay maintenance and property taxes until new tenants are found at likely lower rents, force Noahs into bankruptcy, sue Noahs and other parties for incomplete projects.

Although Noahs is currently insolvent and there is risk associated with Option 1, in my opinion, it continues to be the highest probability of success between these two options in preserving Owners' capital.

**Summary of Option 1 – The Noahs Workout Plan**

***Bil's Commitment*****:** Bil will commit to the following (detailed negotiations to follow and all subject to legal review to ensure 1031 or other legal rights are not surrendered):

1) **Independent Financial Executive** - Bil will allow an independent financial executive to work at the Noahs facility in Utah, to prepare financial statements, to approve all cash expenditures, to oversee annual audits as necessary and to report independently to the Landlord group on a "periodic and as requested basis". He has built in $200,000 per annum of costs into his turnaround plan to pay for this. Rules of engagement to assure independence to be worked out. (Incidentally, Norm has reached out to a few Utah-based accountants to pinpoint a strong executive.)
2) **Financial Statements** – Under the direction of the Independent Financial Executive, Noahs will prepare and distribute monthly financial statements (Income Statement, Balance Sheet and Cash Flow) by the 25th of the following month. Noahs will undergo an annual audit no later than June 30 of the following year by a reputable independent accountant.
3) **Turn-around Plan** – Bil has prepared a turnaround plan to present to Owners. This plan includes:
   a. Operating cost cuts including labor and other overhead cuts
   b. Temporary rent relief to be offset by a Note Payable – making owners whole albeit on a deferred basis.
   c. Repayment of all back Real Estate taxes by December of 2019 – the most pressing taxes will be paid earlier – as needed to avoid significant penalties or foreclosures. Bil will also commit to not be delinquent on taxes again.
   d. Unsecured debtholder negotiations resulting in lower interest payments and interest deferral by certain debt holders.
   e. The construction of all uncompleted facilities.
4) **Rent-Relief 2nd Lien Note** – Bil is willing to have any rent reduction from current contractual commitments be accrued as a note payable. This security will grow each month by adding to principal a) for any foregone rent from that month plus b) interest at an interest rate of 7%. The note would be due the earlier of 10 years OR any change in control of Noahs. The note would be in a second lien position subordinate only to Guggenheim's first lien note of $4.1M. The waterfall of distribution would go to each owner on a pro-rata basis.
5) **Default Provisions** – If Bil materially defaults on a) repayment of property taxes, b) the construction of uncomplete facilities, or c) rent payments under the new schedule, owners will have the right to any of the following:
   i. Appoint a new Chief Executive and a new board – empowered by the bylaws of incorporation – to make all business decisions.
   ii. Issuance of stock certificates that will dilute current owners equal to 25% of the voting stock of the company. Ownership of such certificates will accrue pro-ratably to each owner on the basis of their individual investments.

6) **Transferability –** All rights will inure to any entity or person to whom an owner's TIC interest is sold or transferred. Rights will be fully transferable.
7) **Back Rent Catch Up – (NOTE CHANGE HERE) –** Bil will pay most of the back rents from March 2019 by 4/10 as committed, any missed amounts will be paid by 4/17. (Bil's original commitment did not take into account the fact that payroll is due the week of 4/8.)

***Owners' Commitment:*** In exchange for the commitments from Bil and Noahs noted above, Owners would commit to the following:

8) **Rent Relief –** Rent will be temporarily reduced in accordance with agreed upon schedules. Each schedule will show the rent reduction for a maximum of 3 years and then will return to contractually obligated numbers from the original agreements. As discussed above, all rent relief will be added to the second lien, interest bearing note payable.
9) **Owners' Association –** So that Bil can deal with one entity, the owners will form an association that is able to negotiate on behalf of all owners. The structure will need to be vetted by counsel and will be consistent with the current TIC structure. It will provide a way to gain consensus from owners for purposes of agreeing to any changes to the plan as circumstances may require. Such structure will have an executive team that will be empowered by vote of all TICs.
10) **Materiality Threshold –** As with any business plan, circumstances sometimes shift and needs change. The Owners agree to allow some leeway to commitments made in the business plan. This might be in slight delays or slight under-achievement of committed thresholds. The default provisions will only be triggered if these delays or missed commitments are material at the discretion of the executive team of the Owners association (based on simple majority vote of the TIC groups).

**Status of Work Out Plan Pro-forma**

Bil has submitted several iterations and as of 10:57 PM EST Sunday evening has additional retooling that he must complete. If I were making the decision, I would work with him to get this plan refined and acceptable to the Owners – meaning I would give him more time to refine and perfect the plan. He is making progress in developing a workable plan that has specific milestones that Owners could measure and hold him to account. Here are the highlights of the current state of the plan:

- The plan requires a steeper amount of temporary rent relief than in Bil's original proposal to dig out of the current insolvency situation Noahs is in.
  - Although subject to change as Bil completes his model, to give you an idea of the magnitude of rent reduction needed, current monthly rent obligations totaling $1,568,410 would be decreased to approximately $500,000 per month for 2019 and would be increased each year for 2020 through 2021.

- Bil's plan has rent back to the contracted rates by January 2022 (the $1,568,410 monthly). The difference between the contractual amount and the paid amount would be accrued in an interest-bearing note making owners whole.

- All back-property taxes will be paid by December 2019 (more urgent cases will be paid well before that depending on negotiations with local taxing authorities.)
- Unbuilt buildings will be completed by the end of 2020.

---

APPENDIX

Additional information garnered from recent conversations with Bil that should be of interest and is hereby documented from my notes ***(all unverified)***:

**Unsecured Debt Structure:**

| Debt Holder | Principal | Interest Rate | Comments |
|---|---|---|---|
| Guggenheim | $ 4.1M | 11.0% | First lien, non negotiable |
| Rockwell | $ 6.0M | 8.8% | No preference, deferring payback |
| Long-term holders | $15.5M | 9.0% | No preference but default provisions |
| Linen Supplier | $ 1.1M | None | Converted Accounts Payable |
| **Total** | **$26.6M** | | |

**Equity Structure:**

- Bil owns 4% of the equity. With 30 others (friends of Bil), Bil can influence 60% of the voting stock.
- Corporate decisions are all governed by the Board of Directors made up of Bil, a person names Steve Trombo, and Bil's VP of Marketing.
- According to Bil, some equity holders have asked for Bil to expand the Board and he is willing to do this but wants to get the current situation fixed first.

**Bankruptcy Discussion:**

- As mentioned above, Bil's lawyers have encouraged him to declare bankruptcy.
- Bil has determined that he will work to the end to avoid this unless his hand is forced.
- He feels honor bound not to go that route
- Bankruptcy is "all teed up" but he wants to avoid it.

To All Carmel Owners

I was on a conference call on Thursday evening 5/23/2019 with the other unbuilt Leads. I was hoping to send this update with the latest revision of the Noah's turnaround plan but it has not come. Even though Carmel voted overwhelmingly to say NO to the last workout plan, we will all look at the next one and take another vote. When I receive it I will send it to you.

Included below is where we stand at this moment with Noah's latest plan, and a summary of what the other unbuilts have been pursuing.

After Norm's conference call last week, there were some recommended changes to what he presented to us as V32, but no one seems to have received anything since then. (I sent a link to the recording). In that V32 plan, Noah's was offering to not build the buildings for several of the locations and instead offered us a 10-year unsecured loan for the amount of the sales price of the building. We would have to turn over the land to Noah's. In that call, Norm said that Bil did not want to build Carmel in particular because it had three floors and was too expensive. That is in essence the plan we rejected with a few modifications.

After that call, the other unbuilts reached out to Bil Bowser and Norm and asked them to consider a discounted cash repayment of our investment instead of the unsecured loan or construction of the buildings. The TICs would keep the land for their own sale. They showed how Noah's could save approximately $10M over the current plan to build or loan.

Bil said that he could not do that and offered the unbuilts either the choice to have a building constructed within the next few years, or the unsecured loan. Remember, this would also include reduced rents and the difference between published rents and paid rents to be put in an escrow account for eventual repayment. Anyone signing up for the plan would also have to sign the Forbearance Document I sent to you, waiving certain rights and retaining others.

On the call there were several issues discussed which seem to be consistent across all calls:

1) What does saying yes to the plan mean to those who have 1031's
2) What does this mean to being able to take a theft loss in the event Noah's defaults
3) Does signing the forbearance agreement keep owners from moving forward against any other defendants and how do we retain our rights against Noah's since we have no building and a default would impact unbuilts far worse

There was hearty discussion on whether to hire legal counsel to explore those questions but a vote was not taken by the time I left the call. As you can imagine, it is a difficult choice. Bil has basically said unless you sign on to the Agreement and Forbearance Documents, you will get nothing.

One of the leaders will be speaking to Bil and Norm to see about working out a separate Forbearance Amendment to allow the unbuilts to retain their rights, and to see if they can get Bil to agree to put the construction money into an escrow account and not build anything until there is enough money to complete construction.

There were some who wanted to protect their theft loss status and learn more before signing any documents and others who felt it was important to sign and agree to getting the buildings built over time. I do not know if there is an appetite for the unsecured loan scenario since it would likely wreak havoc with any 1031 exchange issues.

I believe that covers the main points from the meeting. It was more than two hours long by the time I left the others to discuss their legal options. I want to address two issues that came up after this meeting was held:

1) There is some misinformation circulating that all unbuilts other than Carmel have agreed to sign on to Noah's Construction Plan, but that is not correct. They may be leaning that way, but until some of these questions and issues are resolved they have not yet reached a consensus.

2) There is an email from an owner from Dublin, an unbuilt, being circulated which I attach here. It claims that as long as rent is paid to us, then the 1031 is valid. It is being put forth as a reason why a workout plan with Noah's is necessary to maintain our 1031 validity. It only addresses rents, which is one aspect of a 1031. It does not discuss the issue of whether this is a security, Build-to Suit, or the need to have market rate rents, among a host of other issues associated with our particularly hellish situation.

Please, please do not take advice from any source other than your accountant or tax expert. Our situation is not normal and there are many aspects to consider. I do not give tax advice except to say to check with your own experts and share the info with the group if you feel so inclined. Several of our accountants are reaching out to each other and it is good for them to talk this stuff through. I neither agree nor disagree with this email and urge you to speak to someone who can help you decide. We are all in uncharted waters here. (I feel like we are in uncharted shark-infested water most of the time!)

I'll let you know as soon as I get the newest plan version.

Warm regards,

Rosa

NOAH'S DEBT SCHEDULE

## Noah's Debt Schedule

| | Number | Balance | Monthly Payment |
|---|---|---|---|
| Guggenheim | 1 | 4,073,000 | 37,336 |
| Rockwell | 1 | 6,000,000 | 44,000 |
| Credit Club | 29 | 5,176,808 | 51,768 |
| Debts > $100,000 | 26 | 9,546,608 | 77,220 |
| Debts $100,000 and under | 34 | 1,615,633 | 12,112 |
| **Total** | 91 | 26,412,049 | 222,436 |

| | | Effective Intereest Rat | Loan Balance |
|---|---|---|---|
| Existing Loans Outstanding at 3/31/19 | | | 26,412,049 |
| Rockwell write off | | | (6,000,000) |
| Existing Loans O/S as of 5/31/19 | | 4% | 20,412,049 |
| Payment Deferral (negative amortization) | | 4% | 212,081 |
| New Construction Loan | Assume 10 year amortizing | 11% | 8,556,588 |
| New Loans Balance at 12/31/2020 | | | **29,180,719** |

| Note Termination | | Debt Holder | | Current Balance |
|---|---|---|---|---|
| NP | Guggenheim | Guggenheim | | 4,073,000 |
| 6/18/2019 | Debts > $100,000 | Grijalva | Victor | 1,500,000 |
| 4/1/2021 | Debts > $100,000 | East | Sherrie | 997,000 |
| 7/1/2023 | Debts > $100,000 | Sullivan | Doug | 776,226 |
| 4/28/2021 | Debts > $100,000 | Davenport | Judi | 750,000 |
| 8/1/2020 | Debts > $100,000 | Openshaw | Robyn | 670,753 |
| 2/1/2019 | Debts > $100,000 | Cashin | Julie/Brent | 500,000 |
| 8/1/2018 | Debts > $100,000 | Neil | Nancy | 473,000 |
| 10/21/2019 | Debts > $100,000 | Matthews | Kristin | 448,750 |
| 8/1/2021 | Debts > $100,000 | Horrocks | Elaine | 400,000 |
| 12/31/2019 | Debts > $100,000 | Baker | Robert | 354,750 |
| 5/15/2020 | Debts > $100,000 | Schjelderup | William Hassel | 300,000 |
| 7/1/2021 | Debts > $100,000 | Day | LaRayne | 240,000 |
| 7/1/2022 | Debts > $100,000 | Stark | Lorrie | 237,092 |
| 6/18/2022 | Debts > $100,000 | Barsegyan | Ozhen & Vartan | 200,000 |
| 5/26/2020 | Debts > $100,000 | Cashin | Mary Louise | 200,000 |
| 7/1/2021 | Debts > $100,000 | Jones | Alice Fay | 196,848 |
| 5/24/2020 | Debts > $100,000 | Bowser | William | 195,000 |
| 7/1/2019 | Debts > $100,000 | Tyler | Linda | 164,000 |
| 12/1/2019 | Debts > $100,000 | Levingston | Steve | 136,400 |
| 4/30/2021 | Debts > $100,000 | Larsen | J Craig | 127,803 |
| 8/1/2021 | Debts > $100,000 | Bowser | Marilyn | 121,000 |
| 5/11/2020 | Debts > $100,000 | Harker | Kent | 115,000 |

| | | | | |
|---|---|---|---|---|
| 5/26/2020 | Debts > $100,000 | Holmes | Cary | 115,000 |
| 2/1/2019 | Debts > $100,000 | Maricich | Peter | 115,000 |
| 8/1/2021 | Debts > $100,000 | Rakowski | George | 110,736 |
| 7/1/2021 | Debts > $100,000 | Wallace | James | 102,250 |
| 7/20/2021 | Debts $100,000 an | Aaron | Debbie | 100,000 |
| 5/26/2020 | Debts $100,000 an | Holmes | Brad | 100,000 |
| 8/1/2021 | Debts $100,000 an | Horrocks | Elaine | 100,000 |
| 5/19/2020 | Debts $100,000 an | Jennings | Bryan | 100,000 |
| 9/1/2021 | Debts $100,000 an | Morgan | Michael & Verna | 100,000 |
| 5/19/2020 | Debts $100,000 an | Limb | Jeffrey | 80,000 |
| 7/1/2021 | Debts $100,000 an | Gibbs | Gregory | 70,000 |
| 7/1/2021 | Debts $100,000 an | Speer | Steven | 68,800 |
| 5/17/2020 | Debts $100,000 an | Pennington | Keith | 52,500 |
| 8/1/2021 | Debts $100,000 an | Neimann | Edwin | 50,833 |
| 5/26/2020 | Debts $100,000 an | Bailey | Brett | 50,000 |
| 4/27/2020 | Debts $100,000 an | Barker | Linda | 50,000 |
| 5/26/2020 | Debts $100,000 an | Gibson | Brandon | 50,000 |
| 5/26/2020 | Debts $100,000 an | Horrocks/Dorius | Brian/Jody | 50,000 |
| 5/18/2020 | Debts $100,000 an | Peterson | Lyn | 50,000 |
| 5/15/2020 | Debts $100,000 an | Stradley | Marlo | 50,000 |
| NP | Debts $100,000 an | Hadlock | Van & Wendy | 50,000 |
| 5/25/2020 | Debts $100,000 an | Stirling | Bryant | 40,000 |
| 5/26/2020 | Debts $100,000 an | Holmes | Marcia | 39,000 |
| 5/24/2020 | Debts $100,000 an | Bettinson | Jeff | 35,000 |
| 5/24/2020 | Debts $100,000 an | Holmes | Cary | 35,000 |
| 5/15/2020 | Debts $100,000 an | Haacke | Eldon | 33,000 |
| 5/26/2020 | Debts $100,000 an | Holmes | Cory | 31,000 |
| 5/26/2020 | Debts $100,000 an | Wilson | Steve | 30,000 |
| 5/18/2020 | Debts $100,000 an | Briggs | Ivan | 25,000 |
| 1/1/2019 | Debts $100,000 an | Hooser | Don | 25,000 |
| 1/1/2019 | Debts $100,000 an | Hooser | Scott | 25,000 |
| 5/23/2020 | Debts $100,000 an | Steed | Craig | 25,000 |
| 5/24/2020 | Debts $100,000 an | Thompson | Shauna | 25,000 |
| 7/1/2019 | Debts $100,000 an | Goode | Jackie | 20,500 |
| 4/20/2019 | Debts $100,000 an | Davis | Patricia | 20,000 |
| 7/1/2018 | Debts $100,000 an | Packer | Dee & Deanna | 15,000 |
| 1/1/2019 | Debts $100,000 an | Demello | Doriann | 10,000 |
| 4/30/2020 | Debts $100,000 an | Walch | Sidney | 10,000 |
| | | | | 15,235,241 |

**Credit Club:**

| | | | |
|---|---|---|---|
| Credit Club | Jeppson | Alma | 680,000 |
| Credit Club | Peterson | Susan | 500,000 |
| Credit Club | Moyce | Adam | 400,000 |
| Credit Club | Hoke | Chris | 400,000 |
| Credit Club | Peterson | Susan | 263,808 |
| Credit Club | Naylor | Dan | 200,000 |
| Credit Club | Dempsey | Debbie | 200,000 |

| | | | | |
|---|---|---|---|---|
| | Credit Club | Real Mint | | 200,000 |
| | Credit Club | Bonin | Jeannette | 200,000 |
| | Credit Club | Lund | Shawn & Teri | 185,000 |
| | Credit Club | Perricone | Anthony | 150,000 |
| | Credit Club | Lee | Norman | 150,000 |
| | Credit Club | Francom | Matthew | 150,000 |
| | Credit Club | Karumuri | Kiran | 100,000 |
| | Credit Club | Thomas | Benjamin | 100,000 |
| | Credit Club | Ramsey | Pamela | 100,000 |
| | Credit Club | Production Management | | 100,000 |
| | Credit Club | Lewis | Stephen | 100,000 |
| | Credit Club | Herget | Makena | 100,000 |
| | Credit Club | Greco | Ross | 100,000 |
| | Credit Club | Fasko | Ivy | 100,000 |
| | Credit Club | Funk | Thomas | 100,000 |
| | Credit Club | Dryjas | Mark | 100,000 |
| | Credit Club | Dunlop | Jim | 100,000 |
| | Credit Club | Hoke | Aaron | 100,000 |
| | Credit Club | Fairbanks | David | 100,000 |
| | Credit Club | Marcalus | Peter | 66,000 |
| | Credit Club | Perkowski | Lisa | 66,000 |
| | Credit Club | Sedler | Anne | 66,000 |
| | | | | 5,176,808 |
| 2/1/2021 | Rockwell | Rockwell | | 6,000,000 |

INVESTORS LETTER

*WILLIAM & LISA VINCENT*

PO BOX 3048 TUALATIN, OR 97062 | 503-582-1199 | Lisavincent@frontier.com

September 27, 2018

## Attention: Investors Noah's Event Venue & DUO Venues

Dear Shareholder/Investor,

My husband and I were one of the very first investors in Noah's Event Venues and are currently one of the top ten investors in terms of shareholdings. Like most of you we have been very patient waiting for the company to grow large enough to realize a return on our investment. While we have been pleased to see the expansion that has taken place, we have become concerned our substantial investment may never actually receive a payoff. Over the last 18 months we have spent tens of thousands of dollars and hundreds of hours investigating the business practices and corporate documents of Noah's in the hopes our concerns would be alleviated. Unfortunately, what we have learned has only heightened our concerns, including hearing that many of you are paying tax penalties for not being able to take your IRA Required Minimum Distributions (RMD's) for those over 70.5. Below we have summarized ***some*** of the things we have learned. Each one of these are backed by ***facts*** provided by Bil Bowser, Noah's lawyers or Noah's corporate documents.

- **Noah's Revenue is negative.** Although Bil has repeatedly stated that revenue is up corporate tax returns show the company actually has a several million dollar operating loss.
  - Bil has stated that revenue for 2017 was $48,000,000 yet the company is actually operating at a loss due to the operating expenses which include payroll, leases, and supplies.
- **Lack of Board oversight.** Over the past three years, Board members have engaged in management self-dealing and self-enrichment rather than oversight of the company.
  - According to board meeting notes, the three person board has never exercised any accountability in business decisions, business expenses or corporate governance.
    - The Board has continued to approve the sale of Options, Warrants and Convertible Notes thereby diluting shares.
    - Steve Trumbo, who is a member of the Board was allowed to start a linen business so he could sell &/or rent all the linens to Noah's.
    - The Board has approved over $3,000,000 in business expenses for starting businesses which failed within 1.5 years.
    - In May 2017 the Board approved the sale of over $2,700,000 in Convertible Notes to finance DUO which has failed, according to Bil and the lawyers for Noah's.
      - Additionally the Private Placement documents used to raise this money had several false and inaccurate statements.
    - The Board purposely concealed the departure of Jill Krishnamurthy from shareholders for months and only revealed it after we asked their lawyers about it.
    - The Board is allowing Bil Bowser to take compensation from Noah's while at the same time receiving hundreds of thousands of dollars from Rockwell Debt Free Properties. This money was paid directly to a corporation owned by Susanna Bowser, who has also been collecting a paycheck from Noah's.
    - According to Bil Bowser and the lawyers for Noah's the Board cancelled the promised financial audit in March 2018 immediately after Jill left DUO's and has lied and/or concealed this from shareholders.
      - In a meeting on August 9, 2018 with lawyers representing us; Bil Bowser and the lawyers for Noah's, Bil stated that there was no need in having an audit since DUO had failed.

- Past and current members of the board have approved or been directly involved in starting 25 or more companies. Many of these companies have been concealed from the investors/shareholders and many are now defunct: Gabriel Management Crop. , Gabriel Construction, J & J Cubit Construction, Neil Construction LLC., Noah's Construction, Henfinas LLC., Noah Group LLC., Noah Convertible Note LLC., Noah Properties Blocker Corporation, Noah's Property Acquisitions LLC., Emzara LLC., Emzara Management Company LLC., TuaViche Holding Company LLC., OTP INC., DUO Event Venues, Noah's Linens, DUO Linen's, DUO Bar LLC., DUO Construction LLC., Cubit Venue Software LLC., Walby Inc., Customer Connect, Shekar & Oinos (S & O Alcohol), DUO Pay, Noah's Outdoors.

➢ **William Bowser's "Loans" from Gabriel Management a division of Noah's.** Bil has received personal loans from Noah's which are not going to be paid back according to his lawyers. Below are the facts according to corporate documents.

- $187,000 was the first company loan given to Bil in 2005. This was a construction loan to build a garage with office space at his residence.
  - Several years after the building of this garage/office; he and the company back dated an agreement for the company to rent the garage/office to the company. So the building the company paid to have built, was then rented to the company for $2250 per month paid to Bil Bowser. However the company didn't make some of the rent payments, which allowed Bil to deduct the unpaid rent from the construction loan thereby reducing the loan to $170,000.
  - Bil and Susanna have since sold this property and are building a new house in a Park City gated community.
  - There is no documentation provided by him or his lawyers that he paid any of this construction loan back after the sale of the property.
- The other loans were as a result of *additional* pay he had received from Noah's, but he and the company agreed to *reclassify* the pay as loans. This was also done by a document that was back dated several years. All the loans were then consolidated into one loan with an interest rate of 7% annually (not compounded), and are to be paid in full on or before January 1, 2020. Below are the facts from the loan documents.
  - $285,917 First loan and unpaid interest
  - $147,008 Second loan and unpaid interest
  - $   5634  Third loan and unpaid interest
  - $438,560 Total loans and unpaid interest as of 12/31/2009
  - -$72,683 Unpaid rent which Gabriel Management/Noah's was obligated to pay Bil
  - $365,877 New Loan Total
  - $230,502 Amount of interest from 1/1/2010 through 2018
  - $596,379 Grand Total amount due as of 2018.
  - According to a letter from his lawyers, Bil is not going to pay any of this back because of business expenses he has incurred although no documentation was given to substantiate this.

➢ **Rockwell Debt Free Properties.** Bil and the Board have failed to explain to investors the actual relationship between himself, Rockwell Debt Free Properties and Noah Corporation. The statements to shareholders have been misleading.

- Rockwell is the company that has purchased many of the buildings from Noah's. Those buildings are then sold to Rockwell Investors who receive a passive income each month from the leases paid by Noah's.
- Most leases are in excess of $400,000 per year and go up each year.
- Noah's has entered into lease agreements for 10 to 20 years and therefore leases cannot be renegotiated until the leases are up.
- Bil Bowser has been paid by Rockwell to help them "close deals" while at the same time getting a 6 figure income from Noahs. In 2016 alone the payment from Rockwell to Bil was over $100,000. After having several shareholders ask his lawyers about this, they acknowledge in writing that he did receive payments from *"time to time"*.
- Bil has stated that Noah's is making a net profit of $700,000 per building on each sale, yet has not provided any proof of this.
- Rockwell TIC has 975,000 share warrants in Noah Stock.

- **DUO & Financial Audit.** At the March 2, 2018 Shareholder meeting, Bil along with Jill Krishnamurthy, the CEO of DUO told shareholders Noah's was now a product line of DUO's. Jill's departure shortly thereafter was covered up until July 3, 2018 and all the promises made in the shareholder meeting suddenly vanished. Numerous shareholders have told me they had emailed Jill and received no response back from her, which appears to be a deliberate attempt at concealing her departure. A number of documented, inconsistent statements have also been made about Jill, DUO and DUO Pay.
  - Bil has repeatedly told investors in person and in writing, a financial audit was in the works, yet on August 9, 2018 he admitted in a meeting with his lawyers present, *the audit was canceled in March after the departure of Jill.* In the meeting he stated that since DUO failed there was no need for an audit. He also stated that Noah's had never been part of the planned audit.
  - In this same meeting he stated that DUO Pay had also failed, yet in the July 3, 2018 Newsletter he stated they were happy with the financing program started by Jill.
  - Bil and the Board have failed to tell shareholders why DUO failed or what has happened to the DUO shares purchased by some shareholders.
  - To help finance the startup costs of DUO, over $2,700,000 in DUO/Noah's convertible notes were sold in May 2017 according to Noah's lawyers.
    - What will happen to those convertible notes, since DUO has failed?
- **Number of Outstanding Shares.** Bil has repeatedly stated publically and in Shareholder Meeting notes that ***no shares have been sold in the last 5 years.*** However, in the August 9, 2018 meeting with lawyers present, he also admitted he should not have said this since Noah's has continued to issue Options, Warrants and Convertible Notes which are intended to be converted into shares. Additionally, there is much discrepancy in the actual number of outstanding shares.
  - At the 2018 Shareholder Meeting he stated the number of outstanding shares was 25,732,000, yet the Shareholder voting roster lists the number of outstanding shares at 25,129,536. Written correspondence from Noah's lawyers lists a different figure and in the above referenced meeting, Bil admitted he and the leadership of Noah's had been sloppy in their bookkeeping.
- **Noah's Linens / DUO Linens & Director Steve Trumbo.** At the March 2, 2018 Shareholders meeting Bil stated Noah's Linens had been put in a "parking lot". In the Shareholder meeting notes sent out it said; "As a result of reviewing the company and which areas were money makers and which were not, Noah's Linens was *moved out* of the business to a different place. It was too big of an investment for too small of a return. They now rent the linens at an affordable rate." Investors were not told that Steve Trumbo, who is a member of the Board of Directors had opened BAPU LINENS, which is where Noah's linen was *moved to* and where Noah's now gets all their linens from.
  - Investors were not told that over $1,000,000 had been spent on setting up the linen business which failed within 1.5 years.
- **Noah's Bar / DUO Bar:** At the 2018 Shareholder Meeting Bil stated that DUO had acquired, Shekar & Oinos, (S & O Alcohol) which was the liquor company Noah's had *"paired"* with the previous year.
  - S & O Alcohol was started by Bil's son, Eric Wynn. At least $1,000,000 was spent in getting this business off the ground and although Bil has said it is doing well he had also indicated the linen business was doing well in 2017 and then in 2018 it was "moved out" of the company and given to a Board Member.
- **Emzara & Cubit Software**: In the February 5, 2016 Shareholder Meeting notes, it states;"Bil mentioned that the Emzara software is going to provide a huge revenue stream."
  - In the 2017 Shareholder meeting notes with regard to Emzara, it states; "The software concept that was introduced last year we have learned is a black hole essentially and not something we are currently pursuing."
  - Board meeting notes from August 18, 2016 state the board approved spending $2,300,000 to get the business going which failed within 1.5 years.
- **Bylaws and Board Votes:** None of the shareholder votes have been properly documented and proxies do not exist to support the existence of a quorum at any of the shareholder meetings. Failure to follow company bylaws and the resulting exclusion of shareholders from exercising their shareholder rights is a clear violation of corporate policy and state law and brings into question the validity of all corporate actions.
  - The Corporate Bylaws clearly state that shareholders may attend the meetings electronically yet no shareholders have been allowed to do so.

- Steve Trumbo was out of the country at the 2018 Shareholder Meeting, yet he was allowed to cast a vote for himself, Nick Redd and Bil Bowser as Board Members.
- Without his votes a quorum did not exist; nor did he or the Board explain the conflict of interest between his linen company (BAPU LINENS) and Noah's.

➢ **Family & Glassdoor.com Reviews.** While it is typical of startup companies to hire family members just about everyone in Bil's immediate family and extended family, as well as family members of the board and company leadership are now receiving a paycheck from Noah's regardless of their skill set.

- Time and again the reviews of current and former employees on Glassdoor.com state the company is being mismanaged by family members. Another theme echoed is the disorganization and lack of leadership.
- Noah's is not a "family" business. It is a private corporation that has accepted millions of dollars from investors/shareholders who have a right to expect the company leadership to take their fiduciary responsibility seriously and not use the company as a way to employ family and friends.
- Over the last couple of years the payroll for company leadership and their family members has continued to grow despite their actual skill set.

Please understand that my husband and I do not take any pleasure in writing this letter. We want our investment as well as each of yours to bring great rewards for all, however it appears that changes need to take place in order to make that happen. After discussing it with several shareholders, we are proposing the following:

1. An immediate freeze of shares to 25,129,536.
   a. This is the number of outstanding shares listed on the March 2018 Shareholder voting roster.
2. A halt in any sales or transfer of shares, options, warrants and convertible notes so the current Board cannot further enrich themselves
3. No changes to the Bylaws be made unless all shareholders have a chance to review and vote on them.
4. The Board of Directors be expanded from 3 to 7 and possibly 9 Directors to ensure that true oversight is being exercised by the Board.
   a. In order for true oversight the Board would have to consist of both shareholders and independent non-shareholders
5. The immediate resignation of Steve Trumbo from the Board since a clear conflict of interest exists between his business, BAPU LINENS and Noah's.
6. That all payroll be frozen at the current level until the new Board has a chance to review all salaries and positions.
7. Effective immediately, no new contracts be entered into by the Board or anyone within the company until the new Board has a chance to review and approve all existing contracts.

In order to accomplish these things we need to call for a Special Shareholder Meeting, which is within our rights as shareholders according to the Bylaws. This meeting should be available electronically for those not able to attend in person and should be held as soon as is reasonably possible and preferably before the week of Thanksgiving. This would allow a new Board to begin work before the first of the year.

We believe with proper oversight Noah's Event Venue can be a profitable endeavor for each and every one of us. Please contact Lisa Vincent at lisavincent@frontier.com or 503-582-1199 to let us know your support. We are happy to answer any questions you may have.

Sincerely,

William and Lisa Vincent

****Please respond back via email or phone by October 10, 2018 so that we can move forward. Without the support of the shareholders nothing will change.**

COMPLAINT

Casey Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Daniel J. Wadley (10358)
wadleyd@sec.gov
Amy J. Oliver (8785)
olivera@sec.gov
Cheryl M. Mori (8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
351 S. West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel. 801-524-5796
Fax: 801-524-5262

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>WILLIAM J. BOWSER, an individual, CHRISTOPHER J. ASHBY, an individual, SCOTT W. BEYNON, an individual, and JORDAN S. NELSON, an individual,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>Case No.:<br><br>Judge: |
|---|---|

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants William J. Bowser, Christopher J. Ashby, Scott W. Beynon, and Jordan S. Nelson (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1. This case involves an offering fraud related to Noah Corporation ("Noah"), the operator of commercial event centers, and Rockwell Debt Free Properties, Inc. ("Rockwell"), a seller of securities in Noah.

2. William J. Bowser, the founder and (former) President of Noah, along with Christopher J. Ashby, Scott W. Beynon, and Jordan S. Nelson, the founders and owners of Rockwell (the "Rockwell Defendants"), made material misrepresentations and omissions to sell securities comprising fractional, tenant-in-common interests in Noah event centers (herein, the "Noah TIC Interests"). The Noah event centers were, collectively, an unprofitable enterprise sustained only through infusions of new investor funds.

3. Through their misconduct, the Defendants convinced approximately 90 investors to purchase over $35.9 million in securities in the form of Noah TIC Interests between approximately January 2017 and February 2019.

4. The Defendants did not use investor funds as outlined in their offering materials and in their related discussions with investors.

5. Bowser misappropriated and diverted investor funds meant for the development and construction of new event centers to sustain the existing operations of Noah, and the Rockwell Defendants approved Bowser's funding requests without review.

6. Many investors who thought they were purchasing an interest in a thriving event center were left with merely a piece of undeveloped land.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

8. Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

9. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because the Defendants reside in and transact business in this district.

10. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein, and in transactions, acts, practices, and courses of business of similar purport and object.

11. Defendants' conduct took place in connection with the offer, purchase and/or sale of securities.

**DEFENDANTS**

12. William "Bil" J. Bowser, age 58 and a resident of Salt Lake City, Utah, was the founder and President of Noah. Noah had a board of directors consisting of Bowser and two other individuals. Bowser was the principal and control person of Noah. He managed and

controlled Noah's operations and interacted with Rockwell's Noah TIC Interest investors until May 2019.

13. Christopher J. Ashby, age 46 and a resident of Sandy, Utah, was a founder, President, CEO, and 32 ½ percent owner of Rockwell. Ashby solicited investors to purchase Noah TIC Interests.

14. Scott W. Beynon, age 43 and a resident of Kaysville, Utah, was a founder, Vice President, and 30 percent owner of Rockwell. Beynon solicited investors to purchase Noah TIC Interests.

15. Jordan S. Nelson, age 39 and a resident of Sandy, Utah was a founder, an Officer, and 17 ½ percent owner of Rockwell. Nelson solicited investors to purchase Noah TIC Interests.

**RELATED ENTITIES**

16. Noah Corporation is a Utah corporation based in South Jordan, Utah. Noah was formed in September 2003 by Bowser and was a private company owned by Bowser and approximately 500 other shareholders. Noah filed for Chapter 11 bankruptcy in May 2019, and began operating under a restructuring plan. In February 2020, the bankruptcy was converted to Chapter 7, and Noah was ordered to relinquish its operations.

17. Rockwell Debt Free Properties, Inc. is a Utah corporation, formed in October 2009 and based in Sandy, Utah. The owners of Rockwell are Ashby (32 ½ percent owner), Beynon (30 percent owner), Nelson (17 ½ percent owner), and two silent partners (10 percent each). Rockwell previously operated as Rockwell TIC, Inc., a Utah corporation, formed in August 2006. Rockwell filed for Chapter 7 bankruptcy on November 2, 2020 and has ceased operations.

18. Gabriel Management Corporation ("Gabriel") is a Utah corporation, formed in September 2005. Bowser owned and controlled Gabriel and is its President and sole Director. Gabriel operated as Noah's construction arm and did business as "Noah's." Gabriel developed event center properties and made a profit on the construction of those properties. Gabriel's business registration expired July 15, 2020, and Gabriel is no longer in operation.

## STATEMENT OF FACTS

### Noah Corporation

19. Noah, through Bowser, began developing and operating event centers around 2005. Bowser envisioned a national network of high-end event centers, and sold investors on that vision. Noah opened its first event center in January 2007, and by May 2019, Noah operated forty-two event venues across the United States.

20. Around 2013, Bowser decided to sell Noah's event centers (building and real property) and lease them back as a tenant, rather than being an owner-operator of the event centers. In this way, Bowser was able to obtain influxes of cash for current obligations, albeit with the result that Noah's liabilities and monthly expenses increased dramatically because Noah was obligated to make rental payments to the purchasers of the event centers.

21. Bowser established another Utah corporation, Gabriel, to develop Noah's event center properties for profit. Although Gabriel and Noah had separate bank accounts, Bowser continually transferred and commingled funds between accounts. Nearly all the event centers were losing money. Without the continual influx of investor monies and Gabriel's construction profits, Noah could not have sustained the operations of its event centers.

22. Bowser received a salary from Noah. All or most of the salary Bower received from Noah from approximately January 2017 through February 2019 came from new investor funds as Noah was not profitable otherwise.

**Rockwell Debt Free Properties, Inc.**

23. The Rockwell Defendants formed Rockwell in or around 2009 to purchase commercial properties and resell them for profit.

24. The Rockwell Defendants profited by marking up the price of properties they acquired and selling the property off in fractional, tenant-in-common interests to various investors.

25. The Rockwell Defendants received salaries from Rockwell. The salaries paid to the Rockwell Defendants by Rockwell from approximately January 2017 through February 2019 included funds from Noah TIC Interests.

**Rockwell and Noah Partner Together**

26. In 2013, Rockwell began soliciting investors to purchase Noah TIC Interests. Initially, the event centers that were the subject of the Noah TIC Interests were already fully developed and operating.

27. In or around 2015, the Rockwell Defendants and Bowser agreed to develop additional properties together. Pursuant to the parties' agreements, Bowser, through Noah's construction arm, Gabriel, was to locate new properties (in the form of raw land) and construct event centers on those properties. Rockwell was to provide funds to purchase the raw land and finance the development and construction of each event center for an agreed-upon price, which included a profit to Gabriel. Rockwell, as owner of each new property, would then negotiate and enter into a lease agreement with Noah as the tenant.

28. The Rockwell Defendants offered and sold Noah TIC Interests in the undeveloped properties to fund the land purchase and construction costs, and subsequently would assign the lease to the Noah TIC Interest investors. By July 2019, Rockwell had purchased 34 Noah properties for investment and resale to investors.

29. Although the unbuilt event centers were not generating revenues, Rockwell guaranteed to Noah TIC Interest investors that rents would be paid from the time of the investor's purchase of the Noah TIC Interest. But, while Rockwell paid rents to Noah TIC Interest investors for the first nine months after their purchase, it also included the cost of these nine-month rental payment periods in the total price it charged investors for the Noah TIC Interests. This structure was not disclosed to investors.

30. The guaranteed rents from time of purchase were touted as an incentive to purchase Noah TIC Interests, and helped to drive interest in Noah TIC Interests, because it gave the false appearance that Noah was a thriving company.

**Promotion and Sale of Noah TIC Interests**

31. The Rockwell Defendants also provided written materials and additional information to potential Noah TIC Interest investors claiming that Noah was profitable. The written marketing materials stated that Noah had "demonstrated [the] ability to examine and modify [its] business to achieve maximum profitability," and that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels."

32. For those event centers that were not yet developed, the brochures contained photos and renderings of a completed event center, but did not make clear that the centers in which investors would be purchasing an interest were still in development.

33. All Defendants made oral representations to potential investors that Noah was profitable and stable to induce potential investors to purchase Noah TIC Interests.

34. Many investors believed that those undeveloped event centers in which they purchased interests were completed and already generating revenues at the time of their purchase, based on the information contained in the written marketing materials and representations made to them by all Defendants, as well as their receipt of monthly rental payments.

35. Although claiming to conduct a thorough analysis of the tenants in their TIC offerings, the Rockwell Defendants did not conduct due diligence on Noah, as represented in conjunction with investors' purchase of the Noah TIC Interests. Instead, the Rockwell Defendants relied mainly on Bowser's oral representations about the operation and profitability of Noah.

36. From at least March 2015 through at least February 2017, the Rockwell Defendants reviewed financial statements showing that Noah was operating at net losses in 2014, 2015, and 2016, of $3.1 million, $3.3 million, and $3.2 million, respectively. The financial statements further showed that Noah had accumulated losses of approximately $8 million, and had only $3.5 million in assets with $11.5 million in liabilities.

37. The Rockwell Defendants and Bowser knew or should have known that their representations and omissions about Noah's financial condition and future prospects, including that Noah was profitable, were false or misleading.

**Noah's Worsening Financial Problems**

38. In or around late 2016 and early 2017, Bowser and Ashby had discussions about Noah's financial difficulties; including Noah's construction cost overruns, construction delays,

and other issues. Based on these representations by Bowser, Rockwell loaned Noah $6 million in January 2017.

39. The $6 million loan did nothing to alleviate Noah's financial problems. The money was quickly spent to satisfy current obligations, including rents due to Noah TIC Interest investors.

40. The Rockwell Defendants and Bowser failed to disclose to prospective Noah TIC Interest investors their knowledge of Noah's financial difficulties or the $6 million loan.

**Misappropriation of Investor Funds**

41. The Rockwell Defendants represented to investors that their investment funds would be placed into escrow at the title company and disbursed only to purchase an interest in a specific property or to pay for the construction of improvements on the property on a reimbursement basis. In practice, however, Rockwell did not segregate funds in escrow.

42. Contrary to the Rockwell Defendants' representations to investors, Rockwell's and Noah's practice was for Rockwell to receive funds from escrow as soon as Rockwell purchased the raw land for a new event center. Rockwell would then disburse the investor funds to Gabriel, Noah's construction arm, upon receiving a draw request from Bowser on Gabriel's behalf. The draw requests consisted of a form spreadsheet with a list of various construction expenses.

43. Rockwell regularly disbursed funds to Gabriel in response to Bowser's draw requests, but had no controls in place to ensure that the itemized expenses listed in the form spreadsheets were legitimate. The Rockwell Defendants failed to conduct a reasonable inspection to verify that the construction work claimed to be expensed was actually completed.

44. In fact, the draw requests Bowser submitted to Rockwell were fraudulent, and did not list actual expenses. Because Noah never generated enough income to cover its expenses, Bowser regularly used the Gabriel draw requests to obtain investor funds from Rockwell to cover expenses associated with Noah's current operations, including rent payments. Bowser directed that the Gabriel draw requests be falsified to list construction expenses that were not incurred, but that equaled the amount Noah needed at the time to fund its operating expenses and other obligations.

45. In this way, Bowser diverted investor funds earmarked for specific properties and instead used them for Noah's and Bowser's operational and other expenses, and payments to prior investors (through rental payments to Noah TIC Interest owners), rather than for construction of new event centers, as represented.

46. Funds allocated for a specific property were thereby depleted with little or no development. To date, five Noah event center properties remain undeveloped, and all the funds provided by investors through the purchase of Noah TIC Interests for those properties have been depleted.

47. The Rockwell Defendants knew or should have known that the Gabriel draw requests were fraudulent, because the draw requests included construction expenses that were facially inconsistent with the state of development at the new Noah event center properties. For example, Gabriel requested (and received) over twenty percent of the total funds allotted for construction before Rockwell had even purchased the raw land for twelve different Noah event centers under development. Upon a reasonable inspection, it should have been clear that most or all of these expenses could not have been incurred when the land necessary to construct the event centers had not yet been acquired.

48. In or around February 2019, Rockwell informed Bowser that it would no longer develop new event center properties with Noah. This eliminated Noah's access to new Noah TIC Interest investor funds and, as a result, Noah began to miss rent payments owed to existing Noah TIC Interest investors.

49. With the unpaid rent payments, Noah's financial problems were revealed to Noah TIC Interest investors. Some investors learned for the first time that the properties in which they purchased an interest, which they previously believed contained fully developed and revenue-generating event centers, were merely undeveloped pieces of land.

**Defendant Bowser Acted With Scienter**

50. Bowser knowingly engaged in a long-running course of conduct designed to deceive investors.

51. Bowser commingled investor funds and used new investor funds to pay returns to earlier investors in the form of rents to Noah TIC Interest investors.

52. Bowser was fully aware of Noah's financial difficulties because he controlled all of Noah's operations and finances.

53. Bowser has admitted under oath that he knowingly misappropriated and diverted investor funds and that he routinely used revenues from some properties to cover shortfalls at others. In a call with Rockwell investors, Bowser additionally admitted he "robbed Peter to pay Paul."

54. Bowser has also admitted under oath that he knowingly falsified draw requests to Rockwell to obtain investor funds to use improperly.

**Noah TIC Interests Are Securities**

55. The Noah TIC Interests are investment contracts.

56. Investors invested money with Rockwell to purchase individual Noah TIC Interests in real property.

57. The investment in Noah TIC Interests was a common enterprise and an opportunity for profit. Investor monies were pooled together to fund the purchase and/or construction of a specific operating and functional event center, of which each investor would own a percentage of the building and land, in order to provide investors with profits in the form of rental income.

58. The Noah TIC Interest investors expected profits based on the efforts of others, in particular, Rockwell and Noah. Rockwell and/or Noah or their agents were responsible for the location, purchase, development, and construction of the buildings, as well as all management, operations, and maintenance of the event centers to generate profits. The Rockwell Defendants represented and marketed the Noah TIC Interests as a "passive" investment in which the Noah TIC Interest investors had no managerial responsibilities and had only to collect their monthly rental checks.

59. The Rockwell Defendants regularly solicited and negotiated with investors to purchase Noah TIC Interests in specific Noah properties prior to Rockwell actually acquiring a fully developed property. All TIC owners, including Rockwell, were subject to a Tenancy in Common Agreement. Noah TIC Interests were also subject to a "Property Administrator Agreement, which provided that the PA may only be terminated by written notice signed by all co-owners of the property.

**FIRST CAUSE OF ACTION**
**EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD**
**Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
**(Bowser)**

60. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

61. Defendant Bowser, by engaging in conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

62. By reason of the foregoing, Defendant Bowser, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**SECOND CAUSE OF ACTION**
**FALSE STAEMENTS OR OMISSIONS IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**
**(Ashby, Beynon, and Nelson)**

63. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

64. Defendants Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with negligence, obtained money or property by means of untrue statements of material facts and omissions.

65. By reason of the foregoing, Defendants Ashby, Beynon, and Nelson, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]

**THIRD CAUSE OF ACTION**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]**
**(Bowser, Ashby, Beynon, and Nelson)**

66. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

67. Defendants Bowser, Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with negligence or scienter, engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

68. By reason of the foregoing, Defendants Bowser, Ashby, Beynon, and Nelson, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**FOURTH CAUSE OF ACTION**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]**
**(Bowser)**

69. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

70. Defendant Bowser by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, employed devices, schemes, or

artifices to defraud, or engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

71. By reason of the foregoing, Bowser violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**FIFTH CAUSE OF ACTION**
**UNREGISTERED BROKER DEALER**
**Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]**
**(Ashby, Beynon, and Nelson)**

72. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

73. Defendants Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, effected transactions in, or induced or attempted to induce the purchase or sale of securities, without being registered with the Commission.

74. By reason of the foregoing, Defendants Ashby, Beynon, and Nelson violated, and unless restrained and enjoined will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

**RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein.

**II.**

Permanently restraining and enjoining Defendants from violating, directly or indirectly, the securities laws and rules promulgated thereunder they are alleged to have violated.

**III.**

Ordering Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

**IV.**

Ordering Defendants to pay civil monetary penalties pursuant to 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

**V.**

Granting such other and further relief as the Court may deem just and proper.

**VI.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 30th day of December 2020.

Respectfully submitted,

*/s/ Casey Fronk*
Casey Fronk
U.S. Securities and Exchange Commission
*Attorneys for Plaintiff*

MEMO FROM ACCOUNTANT

**BARBARA M. SMITH ACCOUNTING INC.**
*Specializing in Bankruptcy Taxation and Accounting*

**P.O. BOX 957**
**CENTERVILLE, UT 84014**

**Telephone: (801) 451-9889**
**Fax: (801) 451-9852**

**TO: Judge Joel Marker, Philip Jones, Trustee**

**FROM: Barbara M. Smith, CPA**

**DATE: January 11, 2021**

**RE: Noah Corporation**

The purpose of this memorandum is to provide you with additional information regarding the Noah Corporation Inc. ("Noah") bankruptcy estate that I have obtained within the last 5 days. I was contacted by an individual who is associated with the Rockwell investor group. This individual was looking for documentation and bank records in an effort to try and locate how their investment in the debtor was spent. Their theory was that the debtor, Noah, used their funds inappropriately to fund their personal life style rather than use the funds as originally promised by Bowser when he solicited the funds from each individual investor. Since I have had the accounting and bank records in my possession and have also had the opportunity to review many of these records, I, with permission of the Chapter 7 trustee, responded to the request to look through the records for possible misappropriation of the Rockwell inventor funds. I have also, with permission of the Chapter 7 trustee, forwarded documents to this investor group.

Findings of Record Review

As a result of the additional review of the debtor's records, I have made additional findings regarding the activity of the debtor and its principals that I believe merit further investigation. I am recommending that this case be kept open so that the Chapter 7 Trustee can pursue the claims that I have briefly outlined below.

**Insider Transactions**: All of the claims outlined below are with individuals who had a close relationship with the debtor, therefore they should be considered insiders. The relationships as I currently understand them are as follows:

Eric Wynn, who worked with Noah Beverages, is Bowsers step son or a son-in-law.
Katy Jensen is a stepdaughter.
Gabriel Management, who had a management contract with Noah and whose funds were so co-mingled that it should have been included in the bankruptcy filing, was run by Scott Jenson, who is a son-in law to Bowser.
BaPu Linens provided the linens for Noah. Substantial preferential transfers were made to this entity. It was run by Steve Trumbo, who was a member of the Board.
Haley Gardner, a step daughter, received significant funds from a Duo Venues, LLC account. Duo Venues took over the operations of Gabriel Management in June 2018.

**Claims that Must be Pursued:**

It is my opinion that it would be an injustice to the creditors, many of whom are original fund investors who believed they were secured creditors., yet in reality they are unsecured creditors, to close the Noah Bankruptcy before allowing the Trustee, with support of the court, to pursue the following claims.

BAPU Linens. Steve Trumbo received all of the linens and related materials to created BAPU Linens from Noah for no payment. He then charged Noah for the rental of linens. During the 18-month period prior to the petition date, he was paid $650,420. We believe that many of these payments were preferential in nature. The above number does not include any checks he would have received; therefore, the total payments may be even larger. The court needs to allow the Trustee to pursue this claim against a related insider.

Kavniya Technology Solutions. Kavniya received payments of $212,782 during the 18 months prior to the petition date. It is our understanding that these payments were being made for the development of some type of software system to be used to assist with reservations. However, the software was never developed and no services were provided for the funds. This needs to be investigated. Nick Redd may be involved with this entity. He received payment as a consultant as well as had substantial credit card access.

Lakshmi Investments. This company received over $100,000 during the 18 months prior to the petition date. Jill Krishnamurthy, the owner of this company, was being paid to manage DUO through Lakshmi. She was receiving compensation of $80,000 plus 7.65% in commissions. However, there was a dispute and she was terminated. The trustee should be allowed to review the termination agreement and verify that she was not overly compensated.

Bowser Family Members. Susanna Bowser received payments of over $144,000 with no specified purpose. Hayley Gardner was paid over $140,000. Other Bowser family members received payments from the estate with no listed purpose. There are withdrawals from the Noah account that have no name listed as payee and no purpose listed. These total over $80,000 and should be investigated.

Bennett Tueller Deere, Johnson ("BTDJ"). The law firm that represented Noah and all of its entities was paid some preferential payments during the 18 months period prior to the petition. These funds should be allowed to be recovered for the creditors. Additionally, the trustee should be able to investigate if there are any other claims against the law firm due to their substantial involvement in all of Noah's activity from inception through the bankruptcy.

Use of Noah Funds to Build Personal Residence. Based on information as provided by the Rockwell investor group, the trustee and his accountant have learned that funds invested by individuals called the Rockwell investor group, were deposited into bank accounts in the name of Duo Venues LLC, the management company of Noah. These funds were then used by Bowser to pay for what appears to be a personal residence. The funds were paid to J and J Construction, Wise Cabinetry, Scott Jensen, Antonio Concrete, Firefly Masonry, Altract Painting, Premiere Landscaping and Vital and total $1,356,677. The funds of the Rockwell group were put in the Duo Venues account and then those funds were transferred back and forth into the Noah account. The funds were so co-mingled that it is impossible to trace which dollar was a Rockwell fund dollar and which fund was a Noah dollar. However, it is very easy to trace which dollars were spent for the personal use of Bowser. The Chapter 7 Trustee should have the right to pursue the recovery of these funds in behalf of the investors and unsecured creditors. To close the case without allowing the trustee to act in behalf of the creditors would be a travesty and abuse of the bankruptcy system by Bowser and his team.

**Reality of What Happened in the Noah Estate**

The original list of payments to insiders as provided by the debtor in their statement of financial affairs was woefully inaccurate. The list did not include all payments and did not include all insiders. Additionally, the Summary of Payments to insiders as provided by Mr. Hashimoto in his reporting during the Chapter 11 period was also inaccurate. These lists were inaccurate because they did not include the activity of Gabriel Management and Duo Venues. Due to the way that Bowser structured Noah and the associated entities, with the assistance of his legal team at Bennet Tueller Deere and Johnson, all of the money from Noah was paid out to various related

entities for management fees, license fees, etc. The licenses and personal property were transferred by Bowser to these entities for nothing in return. Conveniently, these entities were not included in the bankruptcy filing. They were considered separate entities with individual EINs. However, a review of the cash flowing through the bank statements will show that the monies were never really separated. Rather, all of the money flowed through the bank accounts as cash was needed, with transfers being made in accordance with cash flow needs rather than in accordance to the cleverly drafted management agreements, license agreements, etc. This allowed Bowser to legally take the cash from Noah out of the business as management fees, etc. without having to account to the note holders, yet, in reality, the companies were one single organization, with Bowser moving cash around according to his needs, and taking cash from the investors according to his wishes without being accountable to anyone. The statements made to the investors were merely fly by night promises of a clever salesman who had big dreams and little ability to manage money and fulfill anyone's promises. I completely concur with the ruling of Judge Campbell in the preliminary ruling that Gabriel Management Corporation is the alter ego of Noah.

**Role of Legal Representatives**

Bowser was cleverly assisted in making his house of cards by the law firm of BTDJ. The law firm was paid a substantial amount of money in the 18-month period prior to the petition date. They received a payment of $450,000 via a wire transfer on July 3, 2018. Additional funds of $80,944.75 were wired to them in May 2019. Any payments by check have not yet been identified for purposes of this report. All of the documentation used to create all entities of Bowser and the Noah related entities that I have been able to locate and review were drawn up by BTDJ. Additionally, the registered agent for several of the entities was BTJD Corporate Services, LLC.

**Recommendation**

I believe that the court has no alternative but to allow and support the Chapter 7 Trustee in his attempt to recover funds in behalf of the creditors in this case. In order for the trustee to do so, the court must rule that the Duo Venues LLC and Gabriel Management entities should have been included in the original filing. All of the funds were so co-mingled that no dollar could have been labeled as a dollar of any single entity. Bowser and his legal team conveniently and carefully orchestrated the separation of the entities in a way most beneficial to Bower and in a way least helpful to the creditors. When these creditors invested their funds, they were under the impression they were investing in something that was safe and secured. They believed that the investment had piece of real estate to which they could attach a lien to ensure recovery. However, Bower and his legal team carefully maneuvered and structured and then re-structured the investments so that Bowser could sell the real estate, take the profits for personal use, and then sail away into the sunset. To allow Bowser and his legal team to merely file a Chapter 7 bankruptcy, leaving the creditors holding the bag in this case, would be injustice and mockery of the system.

# Noah Corporation
## Transaction Report
March 28 - May 31, 2019

| # | Account | Date | Transaction Type | Num | Name | Memo/Description | Split | Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Noah Corporation xxx6585 | 04/29/2019 | Expense | | Aba | ONLINE DOMESTIC WIRE TRANSFER VIA: BKRS BK OF TH WEST/102003743 A/C: ABA/104108473 BARTLEY NE BEN: KATYTX. TIC MILES CITY MT 08301 US REF: NOAH'S RENT IMAD: 0429B1QGC03C019475 TRN: 0511200119ES 04/29 | Operating Expenses:Rent or Lease of Buildings:Rent Building | (33,882.29) | | |
| 2 | Noah Corporation xxx6585 | 05/17/2019 | Expense | | Aba | ONLINE DOMESTIC WIRE TRANSFER VIA: BKRS BK OF TH WEST/102003743 A/C: ABA/104108473 BARTLEY NE BEN: KATYTX. TIC MILES CITY MT 08301 US REF: NOAH'S RENT IMAD: 0517B1QGC01C003848 TRN: 4614700137ES 05/17 | Operating Expenses:Rent or Lease of Buildings:Rent Building | (20,000.00) | (58,682.29) | |
| 3 | Noah Corporation xxx6585 | 04/11/2019 | Check | 6484 | Advantage Telecom | Account #2794 Invoice #87848 | 6150 Operating Expenses:Utilities | (11,250.80) | | |
| 4 | Noah Corporation xxx6585 | 05/07/2019 | Check | 6653 | Advantage Telecom | Account #2794 Invoice #99264 | -Split- | (10,682.80) | | |
| 5 | Noah Corporation xxx6585 | 04/08/2019 | Expense | | American Express | AMERICAN EXPRESS ACH PMT W0252 WEB ID: 2000032111 | 2211 Amex Susanna | (1,000.00) | | |
| 6 | Noah Corporation xxx6585 | 05/14/2019 | Expense | | American Express | AMERICAN EXPRESS ACH PMT W6470 WEB ID: 2000032111 | 2211 Amex Susanna | (1,000.00) | | |
| 7 | Noah Beverages xxx6550 | 03/20/2019 | Expense | | American Express | Employee Reimbursement for Susanna Bowser | 6150 Operating Expenses:Utilities | (4,000.00) | | |
| 144 | Noah Beverages xxx6550 | 05/06/2019 | Expense | | Ask Construction | | Ask My Accountant | (15,550.00) | (25,050.00) | |
| 145 | Noah Corporation xxx6585 | 05/28/2019 | Expense | | Ask Construction | ONLINE DOMESTIC WIRE TRANSFER VIA: BANKERS BK MADISON/075912479 A/C: NYMASTER MADISON WI 53717 US IMAD: 0528B1QGC03C010671 TRN: 0300400148ES 05/28 | Ask My Accountant | (9,500.00) | | |
| 8 | Noah Corporation xxx6585 | 05/21/2019 | Expense | ACH | Avant8 | Corporate - Dec. 2018 Bill (Partial Payment - Invoice #2141) | 6000 Operating Expenses:Marketing | (10,000.00) | | who do you think this is? Never heard of Avant8 but |
| 9 | Noah Corporation xxx6585 | 05/21/2019 | Expense | | Avant8 | Online ACH Payment 8219337253 To Avant8 (_[redacted]0341) | 6000 Operating Expenses:Marketing | (10,000.00) | (20,000.00) | marketing expenses sounds like an insider? |
| 10 | Noah Corporation xxx6585 | 04/03/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4063800093ES 04/03 | Operating Expenses:Supplies & Materials:Linens | (17,567.79) | | |
| 11 | Noah Corporation xxx6585 | 04/29/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4439400119ES 04/29 | Operating Expenses:Supplies & Materials:Linens | (14,161.90) | | |
| 12 | Noah Corporation xxx6585 | 05/07/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 3748300127ES 05/07 | Operating Expenses:Supplies & Materials:Linens | (6,429.93) | | |
| 13 | Noah Corporation xxx6585 | 05/06/2019 | Expense | | Bapu Linens | Online ACH Payment 8218493365 To BAPU (_[redacted]1217) | Operating Expenses:Supplies & Materials:Linens | (6,429.93) | | |
| 14 | Noah Corporation xxx6585 | 05/08/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 3350500128ES 05/08 | Operating Expenses:Supplies & Materials:Linens | (6,429.94) | | |
| 15 | Noah Corporation xxx6585 | 05/10/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4087400130ES 05/10 | Operating Expenses:Supplies & Materials:Linens | (6,429.94) | | |
| 16 | Noah Corporation xxx6585 | 05/13/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4318000133ES 05/13 | Operating Expenses:Supplies & Materials:Linens | (9,336.89) | | |
| 17 | Noah Corporation xxx6585 | 05/14/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 8325200134ES 05/14 | Operating Expenses:Supplies & Materials:Linens | (9,386.00) | | |
| 18 | Noah Corporation xxx6585 | 05/15/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4368200135ES 05/15 | Operating Expenses:Supplies & Materials:Linens | (9,386.00) | | |
| 19 | Noah Corporation xxx6585 | 05/16/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4467800136ES 05/16 | Operating Expenses:Supplies & Materials:Linens | (9,336.00) | | |
| 20 | Noah Corporation xxx6585 | 05/17/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 3738200137ES 05/17 | Operating Expenses:Supplies & Materials:Linens | (9,336.00) | | |
| 21 | Noah Corporation xxx6585 | 05/20/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 6208200140ES 05/20 | Operating Expenses:Supplies & Materials:Linens | (8,500.00) | | |
| 22 | Noah Corporation xxx6585 | 05/21/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 3132700141ES 05/21 | Operating Expenses:Supplies & Materials:Linens | (8,500.00) | | |
| 23 | Noah Corporation xxx6585 | 05/21/2019 | Expense | | Bapu Linens | Online ACH Payment 8219447232 To BAPU (_[redacted]1217) | Operating Expenses:Supplies & Materials:Linens | (8,500.00) | | |
| 24 | Noah Corporation xxx6585 | 05/22/2019 | Expense | | Bapu Linens | Online ACH Payment 8219558234 To BAPU (_[redacted]1217) | Operating Expenses:Supplies & Materials:Linens | (8,500.00) | | |
| 25 | Noah Corporation xxx6585 | 05/29/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 4027300149ES 05/29 | Operating Expenses:Supplies & Materials:Linens | (8,500.97) | | |
| 26 | Noah Corporation xxx6585 | 05/30/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 8125200150ES 05/30 | Operating Expenses:Supplies & Materials:Linens | (25,000.00) | | |
| 27 | Noah Corporation xxx6585 | 05/31/2019 | Expense | | Bapu Linens | ONLINE DOMESTIC WIRE TRANSFER A/C: BAPU SUPPLIES INC. PROVO, UT 846043715 REF: LINENS/BNF/LINEN INVOICE PAYMENTS TRN: 2805800151ES 05/31 | Operating Expenses:Supplies & Materials:Linens | (8,500.00) | (180,431.33) | |
| 28 | Noah Corporation xxx6585 | 04/15/2019 | Check | 6529 | BTJD, LLC | Client #21874 Invoice #210132 | 6103 Operating Expenses:Outside Services:Legal Fees | (15,003.86) | | |
| 29 | Noah Corporation xxx6585 | 04/29/2019 | Check | 6611 | BTJD, LLC | Client #21874 Invoice #210132 | 6103 Operating Expenses:Outside Services:Legal Fees | (15,080.86) | | |
| 30 | Noah Corporation xxx6585 | 05/13/2019 | Expense | 6627 | BTJD, LLC | March Bill (Partial) | 6103 Operating Expenses:Outside Services:Legal Fees | (13,477.00) | | |
| 31 | Noah Corporation xxx6585 | 05/21/2019 | Check | 6732 | BTJD, LLC | Client #21874 | 6103 Operating Expenses:Outside Services:Legal Fees | (3,000.00) | | |
| 32 | Noah Corporation xxx6585 | 05/23/2019 | Expense | | BTJD, LLC | ONLINE DOMESTIC WIRE TRANSFER VIA: KEY BK UT SLC/124000737 A/C: BENNETT TUELLER JOHNSON & DEERE SALT LAKE CITY UT 84111 US REF: BNF/PAYMENT FOR AGREEMENT IMAD: 0523B1QGC01C023200 TRN: 0577300143ES 05/23 | 6103 Operating Expenses:Outside Services:Legal Fees | (72,944.75) | | |
| 33 | Noah Corporation xxx6585 | 05/28/2019 | Expense | | BTJD, LLC | ONLINE DOMESTIC WIRE TRANSFER VIA: KEY BK UT SLC/124000737 A/C: BENNETT TUELLER JOHNSON & DEERE SALT LAKE CITY UT 84111 US REF: BNF/PAYMENT FOR AGREEMENT IMAD: 0528B1QGC04C006785 TRN: 0318600148ES 05/28 | 6103 Operating Expenses:Outside Services:Legal Fees | (7,000.00) | (127,584.06) | There is a reason this is kinda red..... |
| 34 | Noah Corporation xxx6585 | 04/01/2019 | Expense | | Cadence | Cadence | Operating Expenses:Rent or Lease of Buildings:Rent Building | (63,913.00) | | |
| 35 | Noah Corporation xxx6585 | 04/03/2019 | Expense | | Cadence | Online ACH Payment 8215696161 To Cadence Rent (_[redacted]6346) | Operating Expenses:Rent or Lease of Buildings:Rent Building | (36,072.00) | | |
| 36 | Noah Corporation xxx6585 | 04/03/2019 | Expense | | Cadence | Online ACH Payment 8215704235 To Cadence Rent (_[redacted]6346) | Operating Expenses:Rent or Lease of Buildings:Rent Building | (33,549.00) | | |
| 37 | Noah Corporation xxx6585 | 04/15/2019 | Expense | | Cadence | ONLINE DOMESTIC WIRE TRANSFER VIA: ZIONS BANCORP/124000054 A/C: CADENCE LEHI UT 84043 US REF: /TIME/13:53 IMAD: 0415B1QGC07C011266 TRN: 6080003100ES 04/15 | Operating Expenses:Rent or Lease of Buildings:Rent Building | (33,987.00) | (178,521.00) | This may be rent - hence not a preference. |
| 38 | Noah Corporation xxx6585 | 04/02/2019 | Check | 6430 | DocuSign Inc | Account #A00420775 | 6031 Operating Expenses:IT Computer & Internet Expense | (3,306.20) | | |
| 39 | Noah Corporation xxx6585 | 04/02/2019 | Check | 6433 | DocuSign Inc | Account #A00420775 | 6031 Operating Expenses:IT Computer & Internet Expense | (3,306.18) | | |
| 40 | Noah Corporation xxx6585 | 04/02/2019 | Check | 6434 | DocuSign Inc | Account #A00420775 | 6031 Operating Expenses:IT Computer & Internet Expense | (3,306.18) | | |
| 41 | Noah Corporation xxx6585 | 04/02/2019 | Check | 6435 | DocuSign Inc | Account #A00420775 | 6031 Operating Expenses:IT Computer & Internet Expense | (3,306.18) | | |
| 42 | Noah Corporation xxx6585 | 04/01/2019 | Check | 6412 | Duke Energy | Account #80673 35626 | 6150 Operating Expenses:Utilities | (310.02) | | |
| 43 | Noah Corporation xxx6585 | 04/09/2019 | Expense | ACH | Duke Energy | Morrisville - Parking Lot March Bill | 6150 Operating Expenses:Utilities | (1,226.30) | | |
| 44 | Noah Corporation xxx6585 | 04/11/2019 | Check | 6486 | Duke Energy | Account #4583-3800-01-2 | 6150 Operating Expenses:Utilities | (748.17) | | |
| 45 | Noah Corporation xxx6585 | 04/11/2019 | Check | 6487 | Duke Energy | Account #4583-3800-01-2 | 6150 Operating Expenses:Utilities | (462.07) | | |
| 46 | Noah Corporation xxx6585 | 04/22/2019 | Check | 6552 | Duke Energy | Account #779 275 5943 | 6150 Operating Expenses:Utilities | (605.87) | | |
| 47 | Noah Corporation xxx6585 | 04/26/2019 | Check | 6568 | Duke Energy | Account #104 038 0164 | 6150 Operating Expenses:Utilities | (865.03) | | |
| 48 | Noah Corporation xxx6585 | 05/01/2019 | Expense | ACH | Duke Energy | Lake Mary - April Bill | 6150 Operating Expenses:Utilities | (1,823.44) | | |
| 49 | Noah Corporation xxx6585 | 05/14/2019 | Check | 6698 | Duke Energy | Account #1486488114 | 6150 Operating Expenses:Utilities | (637.61) | | |
| 50 | Noah Corporation xxx6585 | 05/23/2019 | Check | 6749 | Duke Energy | Account #779 275 5943 | 6150 Operating Expenses:Utilities | (605.87) | | |
| 51 | Noah Corporation xxx6585 | 05/29/2019 | Check | 6783 | Duke Energy | Voided - Account #104 038 0164 | 6150 Operating Expenses:Utilities | - | | |
| 52 | Noah Corporation xxx6585 | 05/02/2019 | Check | 6624 | Elite Landscape Group | Invoice #4548 (Partial Payment) | 6122 Operating Expenses:Repair & Maintenance:Landscaping | (1,618.00) | | |
| 53 | Noah Corporation xxx6585 | 05/29/2019 | Check | 6768 | Elite Landscape Group | Invoice #4548 (Partial Payment) | 6122 Operating Expenses:Repair & Maintenance:Landscaping | (2,000.00) | | |
| 54 | Noah Corporation xxx6585 | 05/29/2019 | Check | | Elite Landscape Group | CHECK 6768 | 6122 Operating Expenses:Repair & Maintenance:Landscaping | (2,000.00) | | |
| 55 | Noah Corporation xxx6585 | 04/26/2019 | Check | 6582 | FedEx | Account #6366-4311-4 | -Split- | (29.00) | | |
| 56 | Noah Corporation xxx6585 | 04/26/2019 | Check | 6568 | FedEx | Account #636642878 | -Split- | (29.00) | | |
| 57 | Noah Corporation xxx6585 | 04/29/2019 | Expense | ACH | FedEx | Corporate - Shipping | 6132 Operating Expenses:Postage/Shipping | (4,294.99) | | |
| 58 | Noah Corporation xxx6585 | 05/30/2019 | Expense | ACH | FedEx | Corporate - Shipping | 6132 Operating Expenses:Postage/Shipping | (1,993.45) | | |
| 61 | Noah Corporation xxx6585 | 03/29/2019 | Expense | | Gabriel Construction | Online Transfer to CHK ...8120 transaction#: 8076764109 | 2310 Gabriel Payable | (30,000.00) | | |
| 59 | Noah Corporation xxx6585 | 04/01/2019 | Expense | | Gabriel Construction | Online Transfer to CHK ...8120 transaction#: 8003587874 | 2310 Gabriel Payable | (7,000.00) | | Since they didn't list them on the Chap 11 filing, these |
| 62 | Noah Corporation xxx6585 | 04/01/2019 | Expense | | Gabriel Construction | | 2310 Gabriel Payable | (35,000.00) | | transfers are subject to scrutiny. |
| 60 | DUO Merchant xxx0382 | 05/31/2019 | Check | | Gabriel Construction | | 2310 Gabriel Payable | (4,500.00) | (96,500.00) | |
| 63 | Noah Corporation xxx6585 | 05/28/2019 | Expense | | Gammage & Burnham PLC | ONLINE DOMESTIC WIRE TRANSFER A/C: GAMMAGE & BURNHAM P.L.C. PHOENIX AZ 85004-4470 TRN: 6013600148ES 05/28 | 6103 Operating Expenses:Outside Services:Legal Fees | (8,402.75) | | |
| 64 | Noah Corporation xxx6585 | 04/11/2019 | Check | 6314 | Granite Landscape | Invoice #22171 & 22170 | -Split- | (1,732.00) | | |
| 65 | Noah Corporation xxx6585 | 04/22/2019 | Check | 6562 | Granite Landscape | Invoice #22171 & 22170 | -Split- | (2,002.63) | | |
| 66 | Noah Corporation xxx6585 | 05/02/2019 | Check | 6623 | Granite Landscape | Invoice #22286 & 22329 & 22363 | -Split- | (2,317.57) | | |
| 67 | Noah Corporation xxx6585 | 05/17/2019 | Check | 6716 | Granite Landscape | Invoice #22364 & 22282 | -Split- | (1,677.86) | | |
| 68 | Noah Corporation xxx6585 | 04/01/2019 | Expense | | Judi Navarro | Online ACH Payment 8217854844 To Judi Navarro (_[redacted]8324) | 7010 Interest | (4,787.50) | | |
| 69 | Noah Corporation xxx6585 | 05/01/2019 | Expense | | Judi Navarro | Online ACH Payment 8217854844 To Judi Navarro (_[redacted]8324) | 7010 Interest | (4,687.50) | | |
| 70 | Noah Corporation xxx6585 | 04/22/2019 | Expense | WIRE | Kavitya | Corporate - January Bill | 1604 Other Assets:Intangible Assets:Website Development | (33,334.00) | | These are the computer deadend program costs |
| 71 | Noah Corporation xxx6585 | 05/29/2019 | Expense | | Kavitya | ONLINE INTERNATIONAL WIRE TRANSFER A/C: ICICI BANK LTD MUMBAI MH 400051 BEN/035005003528 KAVIYA TECHNOLOGY SOLUTIONS PRIVAT REF: FOB03/INVOICE PAYMENT TRN: 4036800149ES 05/29 | 1604 Other Assets:Intangible Assets:Website Development | (7,000.00) | (40,334.00) | |
| 72 | Noah Corporation xxx6585 | 05/16/2019 | Check | 6708 | Kilpatrick Townsend & Stockton LLP | Noah's Event Venue Richardson, TX Settlement | 6103 Operating Expenses:Outside Services:Legal Fees | (13,225.87) | (13,225.87) | Don't know who this company was, but over $10K |
| 73 | Noah Corporation xxx6585 | 05/29/2019 | Check | 6720 | Kone Inc | Customer h330273 | -Split- | (8,218.10) | | |
| 74 | Noah Corporation xxx6585 | 04/01/2019 | Check | 6432 | LandCare | Invoice #133103 | 6122 Operating Expenses:Repair & Maintenance:Landscaping | (1,053.65) | | |
| 75 | Noah Corporation xxx6585 | 04/26/2019 | Check | 6585 | LandCare | Invoice #132573 | 6122 Operating Expenses:Repair & Maintenance:Landscaping | (1,416.23) | | |
| 76 | Noah Corporation xxx6585 | 05/02/2019 | Check | 6630 | LandCare | Invoice #153634 & 162733 | -Split- | (2,198.74) | | |